# STATE OF CONNECTICUT *v.* EDAN F. CALABRESE
## (AC 27916)

Bishop, Gruendel and Borden, Js.

Argued October 31, 2008—officially released August 4, 2009

*Edan F. Calabrese*, pro se, with whom, on the brief, was *Glenn W. Falk*, special public defender, for the appellant (defendant).

*Timothy F. Costello*, deputy assistant state's attorney, with whom, on the brief, were *Michael Dearington*, state's attorney, and *Marc G. Ramia*, assistant state's attorney, for the appellee (state).

*Opinion*

GRUENDEL, J. This case arises from an altercation between the defendant, Edan F. Calabrese, and his mother, Maureen Calabrese. The defendant appeals from the judgment of conviction, rendered after a jury found him guilty of assault of an elderly person in the third degree in violation of General Statutes § 53a-61a

(a) (1),[1] burglary in the second degree in violation of General Statutes (Rev. to 2005) § 53a-102 (a) (1)[2] and interfering with an officer in violation of General Statutes § 53a-167a (a).[3] On appeal, the defendant claims that (1) there was insufficient evidence to support a conviction on any of the counts charged, (2) the court improperly excluded from evidence messages left on his answering machine by the victim and (3) the state engaged in prosecutorial impropriety.[4] We affirm in part and reverse in part the judgment of the trial court.

[1] General Statutes § 53a-61a (a) provides in relevant part: "A person is guilty of assault of an elderly . . . person in the third degree when such person commits assault in the third degree under section 53a-61 and (1) the victim of such assault has attained at least sixty years of age . . . ."

General Statutes § 53a-61 (a) provides in relevant part: "A person is guilty of assault in the third degree when: (1) With intent to cause physical injury to another person, he causes such injury to such person . . . ." The later statute also provides for reckless and criminally negligent assault, but the substitute information charging the defendant only claims that he acted with intent to cause physical injury.

[2] General Statutes (Rev. to 2005) § 53a-102 (a) provides in relevant part: "A person is guilty of burglary in the second degree when such person (1) enters or remains unlawfully in a dwelling at night with intent to commit a crime therein . . . ."

The substitute information charging the defendant includes the alternative theories that he (1) entered unlawfully and (2) remained unlawfully. In its brief to this court, however, the state abandoned its theory that the defendant remained unlawfully in the victim's home and proceeded only under the theory that he entered her home unlawfully.

[3] General Statutes § 53a-167a (a) provides in relevant part: "A person is guilty of interfering with an officer when such person . . . resists . . . any peace officer . . . in the performance of such peace officer's . . . duties."

[4] In this latter claim, the defendant asserts that during the state's closing argument, it engaged in impropriety by improperly describing the law of burglary as it relates to remaining unlawfully in the victim's dwelling. As discussed in part II, we must reverse the defendant's burglary conviction on his evidentiary claim. Consequently, because, on appeal, the state abandoned its theory that the defendant remained unlawfully in the victim's dwelling and proceeded solely under a theory that he unlawfully entered the dwelling; see footnote 2; it is unlikely that this issue will arise on remand, and we, therefore, do not afford it consideration. See *Prentice* v. *Dalco Electric, Inc.*, 280 Conn. 336, 339 n.3, 907 A.2d 1204 (2006), cert. denied, 549 U.S. 1266, 127 S. Ct. 1494, 167 L. Ed. 2d 230 (2007).

The jury reasonably could have found the following facts. The victim, a woman in her seventies,[5] owns two homes in Branford on adjoining properties—she resides in one and the defendant resides in the other. On June 23, 2005, the victim accompanied the defendant to a bank to cash his paycheck.[6] The pair returned to the victim's house where the defendant gave some portion of the proceeds from his paycheck to the victim as a rent payment and asked her to hold an additional sum for him. Concerned that he would use the money to fuel his "drinking problem," the defendant instructed the victim not to return the money to him even if he requested its return. After this exchange, the defendant left the victim's house.

Approximately two hours later, the defendant returned. The defendant asked the victim for some of the money that he left in her care. The victim returned a portion of the money, and the defendant instructed her to continue holding what remained. The defendant then left the victim's house again.

Later that evening, the defendant called the victim to inform her that he would be going to her house to retrieve additional money. She replied: "[I]f you come here, you're not getting any money. Don't come here. Go home. Go to bed. You have to go to work tomorrow." The victim then hung up the telephone on the defendant. The defendant called the victim two more times—the first of these proceeded much as the earlier call did, and the victim did not answer the second call. Nevertheless, the defendant returned to the victim's house again

---

[5] The victim's exact age is not in the record. There is no question or dispute, however, that she falls within the purview of § 53a-61a (a) (1), requiring that "the victim of such assault has attained at least sixty years of age . . . ."

[6] The defendant's account of the events of the day does not include the victim accompanying him to the bank. This point, however, does not affect any of the issues presented on appeal.

at approximately 11:30 p.m. He spent some time knocking on a front window until the victim appeared. The defendant indicated that he believed that the victim was intoxicated at the time. The victim shook her head to indicate that she would not let the defendant into the house, and, after a brief exchange of obscenities, the victim left the window. The defendant then walked to the rear of the house and entered. The defendant claims that he entered through the unlocked back door. At the time of the incident, however, the victim indicated to police that all of the doors and windows were locked and that she believed that he entered through a second floor window.[7]

Upon discovering that the defendant had entered the house, the victim called 911 but hung up before the call was answered. She then entered the bathroom and closed the door, yelling for the defendant to leave her house. She attempted to lock the bathroom door, but the defendant forced it open. The defendant pulled the victim's hair and dragged her from the bathroom by the wrist. In the meantime, the telephone began ringing—presumably the 911 operator—and Branford police eventually arrived at the premises.[8]

---

[7] At trial, the victim testified favorably for the defendant, indicating, for example, that she let him into the house. The state, however, introduced a signed statement made by the victim on the night of the incident that contradicted her testimony at trial. The statement was admitted as a full exhibit pursuant to State v. Whelan, 200 Conn. 743, 753, 513 A.2d 86 ("[w]e . . . adopt today a rule allowing the substantive use of prior written inconsistent statements, signed by the declarant, who has personal knowledge of the facts stated, when the declarant testifies at trial and is subject to cross-examination"), cert. denied, 479 U.S. 994, 107 S. Ct. 597, 93 L. Ed. 2d 598 (1986).

[8] Much of the foregoing was contradicted by the testimony of both the defendant and the victim at trial. The defendant testified: "Did I touch my mother? When I came upon her in the living room after just going in the house, I didn't lay a finger on her. I had no thought of laying a finger on her, none. [I didn't] touch her. She then walked into the kitchen. . . .

"I followed my mother into the kitchen. I was parched. I was upset. My mouth was dry. I went to a cabinet [and] got down a glass. I drank down two glasses of water. After I put down the glass . . . of water, I turned

Officer Jomo Crawford, a Branford police patrolman at the time of the incident, testified that he was the first to arrive at the scene. As he pulled up to the house, he observed the victim walking toward his police cruiser. Her hair was disheveled, she was holding her arm and she was grimacing as she approached the car followed by the defendant. After indicating that the defendant should sit on the front porch, Crawford began to question the victim. The victim told Crawford that the defendant had grabbed her forearm and pulled her hair.

After backup arrived, Crawford attempted to place the defendant in custody. Crawford testified: "I placed the handcuffs on him, I was beginning to double lock the handcuffs, and [the defendant] attempted to pull away from me. At that time, I took him to the ground . . . ." The defendant denies that he attempted to pull away and testified that "Officer Crawford and [another officer] took me by the thighs and the hips and pile drove me into the ground, shoulder and head first, and it shattered my glasses . . . ." Crawford then called for

around to my mother, and she was hanging up the telephone and looking at me, and I asked her what she did, and she said, 'I called 911.' She immediately then walked . . . into the bathroom, and she did so without any restraint by me . . . . She closed the door and, at that point, the telephone started to ring and I assumed that it was 911 calling back. . . .

"I asked her repeatedly to please come and answer the phone, and she refused. I probably stood outside the door for a minute and a half to two minutes, asking her to please answer the [telephone]. . . . I then opened the . . . [sliding] bathroom door . . . . [T]here was my mother, and I repeated, 'Would you please answer the phone?' She refused. That is when I put my hand . . . on her wrist. . . . I took her by the wrist . . . the same way that you would take a misbehaving child . . . and that was to [get her to] answer the phone after dialing 911 and hanging up.

"It was my intent to have her answer the phone to hopefully diffuse the situation. That was the only intent in my mind and that was to move her with her consent, not to drag her, but to move her with her consent over to the telephone. That's all I did. I did not touch her with violence. My mother then, with some degree of force, withdrew her wrist from my hand. . . . When she did that, I let go. . . . I did not squeeze. I did not try to continue to hold her arm. . . . I did not touch my mother's hair."

an ambulance to assist the victim. The victim, however, refused medical treatment.

The state charged the defendant with (1) assault of an elderly person in the third degree, (2) burglary in the second degree and (3) interfering with an officer. The defendant pleaded not guilty to all counts. At trial, the defendant attempted to introduce messages left on his answering machine by the victim before the incident, which he claims would have impeached the credibility of the statement that the victim made to police at the time of the incident. The court, however, did not permit the messages to be admitted into evidence. The jury thereafter found the defendant guilty on all three counts, and the court rendered judgment accordingly. The defendant was sentenced to one year imprisonment on the assault conviction, thirty days imprisonment on the interfering conviction and eight years imprisonment on the burglary conviction, execution suspended after three years, and five years of probation. This appeal followed.

I

SUFFICIENCY OF THE EVIDENCE

We begin with the defendant's claims that there was insufficient evidence adduced at trial to prove beyond a reasonable doubt that he committed assault of an elderly person in the third degree, committed burglary in the second degree and interfered with an officer. We review those claims regardless of our determination of the defendant's evidentiary claim because "if the defendant prevails on the sufficiency claim[s], he is entitled to a directed judgment of acquittal rather than to a new trial." *State* v. *Calabrese*, 279 Conn. 393, 401, 902 A.2d 1044 (2006).[9] We also note that our "sufficiency

[9] We discuss *State* v. *Calabrese*, supra, 279 Conn. 393, throughout this opinion because the two cases involve very similar facts and the same defendant and victim. In addition, that case, as discussed in part II, directly governs our determination of the defendant's evidentiary claim. It should

review does not require initial consideration of the merits of [the defendant's evidentiary claim] . . . . Claims of evidentiary insufficiency in criminal cases are always addressed independently of claims of evidentiary error." (Internal quotation marks omitted.) Id., 401–402.

"The standard of review we apply to a claim of insufficient evidence is well established. In reviewing the sufficiency of the evidence to support a criminal conviction we apply a two-part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the [finder of fact] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt. . . .

"We note that the jury must find every element proven beyond a reasonable doubt in order to find the defendant guilty of the charged offense, [but] each of the basic and inferred facts underlying those conclusions need not be proven beyond a reasonable doubt. . . . If it is reasonable and logical for the jury to conclude that a basic fact or an inferred fact is true, the jury is permitted to consider the fact proven and may consider it in combination with other proven facts in determining whether the cumulative effect of all the evidence proves the defendant guilty of all the elements of the crime charged beyond a reasonable doubt. . . .

"Moreover, it does not diminish the probative force of the evidence that it consists, in whole or in part, of evidence that is circumstantial rather than direct. . . . It is not one fact, but the cumulative impact of a multitude of facts which establishes guilt in a case involving substantial circumstantial evidence. . . . In evaluating evidence, the [finder] of fact is not required to accept

be noted, however, that the two cases arise from separate incidents and are procedurally unrelated.

as dispositive those inferences that are consistent with the defendant's innocence. . . . The [finder of fact] may draw whatever inferences from the evidence or facts established by the evidence it deems to be reasonable and logical. . . .

"Finally, [a]s we have often noted, proof beyond a reasonable doubt does not mean proof beyond all possible doubt . . . nor does proof beyond a reasonable doubt require acceptance of every hypothesis of innocence posed by the defendant that, had it been found credible by the [finder of fact], would have resulted in an acquittal. . . . On appeal, we do not ask whether there is a reasonable view of the evidence that would support a reasonable hypothesis of innocence. We ask, instead, whether there is a reasonable view of the evidence that supports the [finder of fact's] verdict of guilty." (Citations omitted; internal quotation marks omitted.) *State* v. *Meehan*, 260 Conn. 372, 377–79, 796 A.2d 1191 (2002).

A

Assault of an Elderly Person in the Third Degree

With these principles in mind, we turn first to the defendant's claim that the state failed to produce sufficient evidence to sustain the jury's verdict finding him guilty of assault of an elderly person in the third degree. In order to convict on this charge, the state was required to prove that, with intent to do so, the defendant caused physical injury to a person who is at least sixty years old. See General Statutes § 53a-61a (a) (1); footnote 1. The defendant asserts that there was insufficient evidence to prove two elements of the crime beyond a reasonable doubt—namely, (1) that he intended to cause physical injury and (2) that he actually caused such physical injury. We begin with the latter.

Physical injury is defined as "impairment of physical condition or pain . . . ." General Statutes § 53a-3 (3).

There is no direct evidence in the record to indicate that the defendant caused pain or physical impairment to the victim. In addition, the victim testified at trial that the defendant did not hurt her in any way. The victim also refused medical treatment on the night of the incident, noting on the paramedic report, "I'm fine, no injuries."

There is circumstantial evidence, however, that the victim was physically injured. First and foremost is the victim's statement made to police at the time of the incident. In that statement, she indicated that the defendant "grabbed me by the arm and the hair and pulled me out of the bathroom." Although the statement does not mention pain or impairment, the jury reasonably could infer, on the basis of its knowledge and experience, that grabbing the arm and pulling the hair of a woman in her seventies would cause her pain. "Jurors are not expected to lay aside matters of common knowledge or their own observation and experience of the affairs of life, but, on the contrary, to apply them to the evidence or facts in hand, to the end that their action may be intelligent and their conclusion correct." (Internal quotation marks omitted.) *State* v. *Padua*, 273 Conn. 138, 157, 869 A.2d 192 (2005).

Furthermore, Officer Crawford testified that as the victim approached his cruiser from the house, she was holding her arm with a grimace on her face. He also testified that he called for an ambulance to attend to the victim, which is done "only in cases where you have . . . visible injury or the party is complaining of pain or injury." Construed in the light most favorable to sustaining the verdict, this testimony, coupled with the victim's statement to police, reasonably could lead a jury to conclude beyond a reasonable doubt that the victim suffered pain or physical injury.

We next turn to the defendant's claim that there was insufficient evidence to prove that he intended to cause

physical injury beyond a reasonable doubt. "It is axiomatic that the fact finder may infer intent from the natural consequences of one's voluntary conduct." *State* v. *Cobb*, 251 Conn. 285, 450, 743 A.2d 1 (1999), cert. denied, 531 U.S. 841, 121 S. Ct. 106, 148 L. Ed. 2d 64 (2000). This being the case, because we concluded that the jury could have found beyond a reasonable doubt that the defendant caused physical injury to the victim, it also could have found beyond a reasonable doubt that he intended those consequences. The state, therefore, presented sufficient evidence to permit the jury to find the defendant guilty of assault of an elderly person in the third degree.

B

Burglary in the Second Degree

We next address the defendant's claim that the state produced insufficient evidence to support a conviction of burglary in the second degree. In order to convict on this charge, the state was required to prove beyond a reasonable doubt that the defendant entered or remained in the victim's house unlawfully at night with intent to commit a crime therein. See General Statutes § 53a-102 (a) (1); footnote 2. Specifically, the defendant argues that there was insufficient evidence on the elements of (1) unlawful entry and (2) intent to commit a crime.

A person enters or remains unlawfully "when the premises, at the time of such entry or remaining, are not open to the public and when the actor is not otherwise licensed or privileged to do so." General Statutes § 53a-100 (b). Construing the evidence in the light most favorable to sustaining the verdict, we conclude that there was sufficient evidence from which the jury could find beyond a reasonable doubt that the defendant unlawfully entered the victim's house, notwithstanding the

testimony of the defendant and the victim to the contrary. The victim indicated to the police at the time of the incident that all the doors and windows to the house were locked. Further, the defendant testified at trial that when he was knocking on the front window of the victim's house attempting to be let in, he observed the victim through the window. "[She] marched in place with her feet . . . [and] moved her arms in unison with her marching legs while at the same time showing [the defendant] her middle finger from both hands while marching . . . . And at the same time she did that . . . she mouthed the words 'fuck you.'" These facts alone are sufficient to establish beyond a reasonable doubt that the defendant entered the victim's house without her permission.

The defendant asserts, however, that he was privileged to be in the victim's house. He argues that there exists in Connecticut a privilege to enter another's home to retrieve goods.[10] This is simply not the case. The only Connecticut case cited by the defendant involves the retrieval of stolen property. See *State* v. *Gelormino*, 24 Conn. App. 563, 590 A.2d 480, cert. denied, 219 Conn. 911, 593 A.2d 136 (1991). Indeed, Connecticut does provide a statutory privilege to use "reasonable physical force upon another person . . . when and to the extent he reasonably believes such to be necessary to regain property which he reasonably believes to have been acquired by larceny . . . ." General Statutes § 53a-21. Conversely, in the present case, the defendant voluntarily gave his property to the victim. That being the

---

[10] In addition to the defendant's claim that this supposed privilege negates the element of burglary requiring unlawful entry, he also claims that he was entitled to a jury instruction so indicating. Because we conclude that no privilege exists to recover nonstolen property and because the defendant readily admitted that he voluntarily gave his property to the victim, we also conclude that he was not entitled to any such instruction.

case, no such privilege existed for him to enter the victim's house.[11]

The defendant also claims that he did not enter the house with intent to commit a crime therein as required for a burglary conviction. The state argued that the crime the defendant intended to commit when he entered the house was either assault in the third degree or disorderly conduct.[12] We conclude that the state met its burden of providing sufficient evidence on each of these alternative theories.

As discussed previously, the jury may draw inferences from the evidence presented based on its common knowledge and experience. *State* v. *Padua*, supra, 273 Conn. 157. The victim twice told the defendant over the telephone not to come to her house, but he went to the house anyway. Further, once the defendant was at the house, he began banging on the front window. He entered the house despite the victim having made it quite clear that he was not welcome. All of these facts reasonably could lead the jury to conclude, on the basis of its knowledge and experience, that the defendant entered the house with intent to commit disorderly conduct. In addition, once in the house, the

---

[11] The defendant further asserts that whether or not he was privileged to enter the victim's house, he believed that he was privileged to do so. As such, he claims, he could not knowingly or intentionally enter the defendant's home unlawfully. This is of no import because, when viewing the evidence in the light most favorable to sustaining the verdict, it is clear that the jury could have concluded that the defendant knew that he was not licensed or privileged to enter the victim's house. Moreover, the defendant's subjective belief regarding the status of the law is irrelevant. See *State* v. *Knybel*, 281 Conn. 707, 713, 916 A.2d 816 (2007) ("ignorance of the law excuses no one from criminal sanction").

[12] The crime of disorderly conduct is set forth in General Statutes § 53a-182 (a), which provides in relevant part: "A person is guilty of disorderly conduct when, with intent to cause inconvenience, annoyance or alarm, or recklessly creating a risk thereof, such person: (1) Engages in fighting or in violent, tumultuous or threatening behavior; or (2) by offensive or disorderly conduct, annoys or interferes with another person . . . ."

defendant committed assault in the third degree. See part I A. "It is axiomatic that the fact finder may infer intent from the natural consequences of one's voluntary conduct." *State* v. *Cobb*, supra, 251 Conn. 450. As such, the jury could have reasonably concluded that the defendant entered the house with intent to assault the victim.

## C

### Interfering with an Officer

Finally, we turn to the defendant's claim that the state produced insufficient evidence to support a conviction of interfering with an officer. In order to convict on this charge, the state was required to prove beyond a reasonable doubt that the defendant resisted a Branford police officer in the performance of his duties. See General Statutes § 53a-167a (a); footnote 3. This case presents a situation in which the police account differs from that of the defendant. Officer Crawford indicated at trial that the defendant pulled away during the handcuffing procedure; the defendant denies that he did so and further asserts that he had no intent to do so.

Although the jury may not give greater weight to the testimony of the police simply because of their profession or authority; see *State* v. *Singleton*, 95 Conn. App. 492, 504–505, 897 A.2d 636, cert. denied, 279 Conn. 904, 901 A.2d 1228 (2006); the jury was free to give credence to the testimony of one witness over the conflicting testimony of another. As an appellate court, "[w]e do not sit as a [seventh] juror who may cast a vote against the verdict based upon our feeling that some doubt of guilt is shown by the cold printed record. . . . Rather, we must defer to the jury's assessment of the credibility of the witnesses based on its firsthand observation of their conduct, demeanor and attitude." (Internal quotation marks omitted.) *State* v. *Jason B.*, 111 Conn. App. 359, 363, 958 A.2d 1266 (2008), cert.

denied, 290 Conn. 904, 962 A.2d 794 (2009). The jury chose to credit the police officer's testimony and not the defendant's, and that testimony could establish beyond a reasonable doubt that the defendant pulled away from the officer as he was attempting to handcuff the defendant. See *State* v. *Sitaras*, 106 Conn. App. 493, 498–502, 942 A.2d 1071 (affirming conviction of interfering with officer despite conflicting testimony), cert. denied, 287 Conn. 906, 950 A.2d 1283 (2008).

The defendant asserts that even if that was the case, he did not intend to pull away. Again, the jury was not required to credit his protests regarding his intent to interfere with the police. Rather, if it found that he did in fact pull away from the officer and that such action constituted interference, it could likewise conclude that he intended the consequences of his voluntary actions. See *State* v. *Cobb*, supra, 251 Conn. 450. Therefore, there was sufficient evidence produced at trial from which the jury reasonably could have concluded that the defendant was guilty of interfering with an officer beyond a reasonable doubt.

II

EVIDENTIARY CLAIM

The defendant next claims that the court improperly refused to admit into evidence the answering machine recording of the victim threatening him. During the defendant's testimony, he attempted to introduce into evidence a tape recording made from answering machine messages that the victim had left for him. The defendant alleged that the messages were left on his answering machine in October, 2002, by the victim while she was intoxicated. The defendant argued that the recordings would be used to impeach the victim's credibility in her statement made to police on the night of the incident. He further argued that the recording, in which the victim indicates that she will call the police

if the defendant refused to bring her groceries and a sandwich, could illustrate "her inclination to fabricate statements . . . to the police about me when she's intoxicated."[13] The state objected, asserting that it believed the recording to be irrelevant. It argued that the recording did not reflect the victim's state of mind at the time of the incident at issue and that the messages, which allegedly were left on the defendant's answering machine in 2002, were too remote in time. The court sustained the state's objection and refused to admit the recording into evidence.

We begin by noting that the trial court's rulings on the admissibility of evidence are generally afforded great deference. *State* v. *Calabrese*, supra, 279 Conn. 406–407. In the present case, however, the state concedes, and we agree, that the court improperly excluded the evidence at issue in view of our Supreme Court's decision in *Calabrese*. In light of that decision, we do not find it necessary to engage in an extensive analysis of the

---

[13] "In its entirety, the answering machine recording contained a string of separate messages from the [victim] and provided as follows:

'Edan.

'Please pickup Edan.

'Would you pick up please?

'Pick up will you? [PAUSE] Are you there?

'Are you there? [PAUSE] Pick up. Pick up if you're there. [PAUSE] I just wanted to say good luck and I love you.

'Are you there? Pick up. [PAUSE] [Sigh] Are you there?

'Pick up. [PAUSE] Pick up! [PAUSE] Pick up! [PAUSE] You prick!

'You'd better come down here and pick up the pork and bring my groceries down here before I call the police.

'Pick up. Won't you pick up?

'I asked for a goddamn sandwich and I never got it and I had a call from the victim's advocate and you are in a hell of a lot of trouble if you don't bring me my sandwich—cheeseburger! You better bring it here and leave it right on the doorstep you son of a bitch you bastard!

'Pick up. [PAUSE] Please pick up.

'Please pick up. [PAUSE] Please pick up.' " *State* v. *Calabrese*, supra, 279 Conn. 406 n.17. Although the two cases are procedurally unrelated, the Supreme Court case involved an effort by the defendant to introduce the same recording of the victim in an attempt to impeach her credibility.

reasons that the recording was both relevant and admissible. Because, however, the dissent's only point of departure from our opinion involves the extent to which the earlier *Calabrese* case is applicable and binding, we briefly address our Supreme Court's discussion of relevancy and admissibility in that case: "[T]he messages were admissible nonhearsay evidence under § 6-5 of the Connecticut Code of Evidence, under which '[t]he credibility of a witness may be impeached by evidence showing bias for, prejudice against, or interest in any person or matter that might cause the witness to testify falsely. . . .' We can think of no better evidence of animus that might show a motive for making false allegations than the threats of seeking the arrest of the defendant if he did not comply with her wishes, and other invectives, contained in the messages that the trial court improperly excluded from the jury's consideration." (Citation omitted.) Id., 410. That discussion demonstrates the relevance and admissibility of the recording in the present case. Although the recording was made nearly three years before the incident in question, it indicates a bias on the part of the victim that arises when she is intoxicated. As the Supreme Court noted, "[t]he answering machine messages at issue . . . relate directly to the relationship between the defendant and the [victim], and are evidence of the animosity between them, as well as the [victim's] use of threats involving the authorities to get the defendant to do her bidding." Id., 410 n.19. This is the type of evidence that a jury may fairly consider to be not necessarily affected by the passage of time. Therefore, in light of the holding and reasoning of *Calabrese,* we conclude that the court improperly excluded the answering machine recordings from evidence.

Having established that the court improperly excluded the recording from evidence, we must next

"consider whether the defendant has proven that impropriety to be harmful error requiring that he receive a new trial." Id., 411. "[T]he proper standard for determining whether an erroneous evidentiary ruling is harmless [is] whether the jury's verdict was substantially swayed by the error. . . . In applying this standard, which expressly requires the reviewing court to consider the effect of the erroneous ruling on the jury's decision, an appellate court may conclude that a nonconstitutional error is harmless only when it has a fair assurance that the error did not substantially affect the verdict. . . . In reviewing the case, we consider a number of factors, namely, the overall strength of the state's case, the impact of the improperly admitted or excluded evidence on the trier of fact, whether the proffered evidence was cumulative, and the presence of other evidence corroborating or contradicting the point for which the evidence was offered." (Citations omitted; internal quotation marks omitted.) Id., 411–12, citing *State* v. *Sawyer*, 279 Conn. 331, 357–58, 904 A.2d 101 (2006).

With regard to the burglary and assault charges, we are not left with the requisite "fair assurance that the error did not substantially affect the verdict." The only evidence that the defendant unlawfully entered the victim's home, the home in which he grew up, is the statement of the victim made at the time of the incident while she was allegedly intoxicated, and testimony of the victim and the defendant indicating that the victim told him not to come into the house. The recording may well have persuaded the jury that the victim's statement made to police was fabricated or otherwise exaggerated. The same is true of the assault charge. The primary evidence that the defendant attacked the victim was her statement made at the time of the incident and the fact that she was holding her arm with a grimace on her face when the police arrived on the scene. The recording similarly may have persuaded the jury that

the claims of pain or injury were likewise fabricated or exaggerated. As such, we find it necessary to reverse the judgment of the trial court with regard to those two counts.

The defendant's conviction of interfering with an officer, however, did not depend on any statements or testimony given by the victim. Consequently, the recording would not have affected that verdict. Therefore, the judgment of the trial court with regard to the defendant's conviction of interfering with an officer is affirmed.

The judgment is reversed only as to the conviction of burglary in the second degree and assault of an elderly person in the third degree, and the case is remanded for a new trial on those counts. The judgment is affirmed in all other respects.

In this opinion BORDEN, J., concurred.

BISHOP, J., concurring and dissenting. I agree with the majority that the evidence was sufficient to sustain the trial court's judgment of conviction. I disagree, however, with my colleagues' conclusion that the court incorrectly excluded from evidence a tape of messages left on the answering machine of the defendant, Edan F. Calabrese, and that the exclusion of this evidence likely affected the jury's verdict as to the charges of assault of an elderly person in the third degree in violation of General Statutes § 53a-61a (a) (1) and burglary in the second degree in violation of General Statutes § 53a-102 (a) (1). Accordingly, I would affirm the judgment of the trial court as to the conviction on those charges, as well as the judgment of conviction on the charge of interfering with an officer.

In the case at hand, the pro se defendant attempted to introduce a tape of telephone messages left on his

answering machine in October, 2002, by his mother, the victim. The defendant claimed that the messages bore on the victim's credibility because they demonstrated her motive and inclination to fabricate statements and her inability to perceive events accurately when she is intoxicated. The defendant claimed that the victim was intoxicated when she left the messages on his answering machine and, therefore, he argued, the taped messages supported his contention that the statement she made to the police on the evening of the incident was fabricated and the consequence of her intoxication. The court excluded the messages from evidence on the basis of the state's claim that they were not relevant.

In assessing the correctness of the court's ruling, we engage in a three tiered review. Our first question is whether the proffered evidence was relevant. Relevant evidence is evidence "having any tendency to make the existence of any fact that is material to the determination of the proceeding more probable or less probable than it would be without the evidence." Conn. Code Evid. § 4-1. The materiality component requires that the proffered evidence be "material to the determination of the proceeding . . . ." *State* v. *Bonner*, 290 Conn. 468, 496–97, 964 A.2d 73 (2008). Additionally, "[r]elevance depends on the issues that must be resolved at trial, not on the particular crime charged." (Internal quotation marks omitted.) *State* v. *DeJesus*, 270 Conn. 826, 837, 856 A.2d 345 (2004). As noted in the commentary to § 4-1, "[t]he materiality of evidence turns upon what is at issue in the case . . . ." Conn. Code Evid. § 4-1, commentary. Second, if we determine that the proffered evidence was relevant, we must assess whether the court abused its discretion in excluding it. In this step, a reviewing court must be mindful that "[i]t is the obligation of the party offering the evidence

to establish its relevance, and [e]very reasonable presumption should be made in favor of the correctness of the court's ruling in determining whether there has been an abuse of discretion." *State* v. *Johnson*, 107 Conn. App. 188, 194, 944 A.2d 416, cert. denied, 288 Conn. 905, 953 A.2d 650 (2008). Finally, if a reviewing court concludes that evidence was improperly excluded, the court must then engage in an analysis of whether the exclusion was harmful so as to cause reversal. The majority concludes that the court's evidentiary ruling was improper and harmful. I believe that the court's evidentiary ruling was within its discretion. Additionally, even if it could be said that the court improperly excluded the proffer, I do not believe that there is a reasonable basis for concluding that the jury's verdict was "substantially swayed" by the court's evidentiary ruling.

I begin my analysis with the noncontroversial proposition that the determination of "whether evidence is relevant and material to critical issues in a case is an inherently fact bound inquiry." (Internal quotation marks omitted.) *State* v. *Rodriguez*, 107 Conn. App. 685, 710, 946 A.2d 294, cert. denied, 288 Conn. 904, 953 A.2d 650 (2008). Rather than conduct such an inquiry on the basis of the facts at hand, the majority appears to rely on the earlier opinion of our Supreme Court in *State* v. *Calabrese*, 279 Conn. 393, 902 A.2d 1044 (2006), and the state's concession that the holding of *Calabrese* is binding on the case at hand. The majority's reliance on the state's concession that the holding of *Calabrese* renders the evidence relevant in this action is misplaced in light of our jurisprudence that a reviewing court is "not bound by [the] ill advised concessions of any party . . . ." (Citation omitted.) *State* v. *Reddick*, 224 Conn. 445, 463 n.19, 619 A.2d 453 (1993). As the court in *Reddick* opined, even where the state has made a concession, "[j]ustice does not require that we turn a blind

eye to the trial record in adjudicating claims on appeal." Id. Thus, I do not believe that this court is relieved of its independent responsibility of review simply because of the state's errant concession. In this instance, our responsibility is to consider the appeal on its merits despite the state's concession that the trial court abused its discretion. See *State* v. *Avery*, 199 Conn. 377, 379 n.2, 507 A.2d 464 (1986).

Respectfully, I disagree that the outcome of this issue in the present case is determined by *Calabrese*. On the basis of its conclusion that the ruling of the Supreme Court in *Calabrese* binds this court on review, the majority has not engaged in any analysis of the trial court's ruling; clearly it accorded it no presumption of correctness. If, of course, this action were merely a retrial of the factual issues presented in *Calabrese*, this court, on review, would be in a different position, but, even though *Calabrese* involved the same victim and defendant and the same telephone messages as in this appeal, it encompassed its own unique predicate facts. I believe that the significantly different factual circumstances confronted by the court in *Calabrese* and those we face render the court's determination of relevance in *Calabrese* unhelpful to our present inquiry.

In *Calabrese*, our Supreme Court noted in its review of the record that neither the complainant nor the defendant testified at trial.[1] The court noted evidence that police were called to the then sixty-nine year old complainant's home on the evening of January 4, 2002, where they found the home in a state of disarray and the disheveled and upset complainant lying on the floor with dried blood on her nightgown and surrounded

---

[1] Indeed, because the victim did not testify in *Calabrese*, the defendant urged the trial court to admit the telephone messages as the only route available to him to contest her credibility.

by blood soaked paper towels.[2] When interviewed, the complainant claimed that she had been injured at approximately 10 a.m. that morning when attempting to block a vase that had been thrown at her. That evening she refused transport to a hospital. On the next day, however, the complainant's son, William Calabrese, Jr., took her to the hospital where she was diagnosed with a fractured elbow. The treating surgeon was permitted to testify, over the defendant's objections, that the complainant told him that her injury was caused by a vase thrown by her son, and he stated that her injury was consistent with that allegation. The physician testified, as well, that he was unaware that the complainant had told a nurse that she had injured herself when she had fallen in the bathroom. The court, in *Calabrese*, also permitted a police officer to testify that he arrested the defendant on the basis of the complainant's statement to him.[3] At trial, the defendant had offered as evidence a tape recording of messages from the complainant left on his answering machine in which she uses invective and threatening language aimed, purportedly, at manipulating the defendant into complying with certain demands. The court excluded the tape from evidence.

On appeal, our Supreme Court determined that the court had abused its discretion in excluding the tape and that the exclusion likely swayed the jury to find

---

[2] *Calabrese* involved charges stemming from two incidents between the victim and the defendant. The first occurred on January 4, 2002, and gave rise to the assault conviction then under appeal. In conjunction with his arrest for the January incident, the defendant had been made subject to a family violence protective order. The second incident took place in September, 2002, and gave rise to the defendant's conviction of violation of the protective order. On appeal, the *Calabrese* court affirmed the conviction of violation of a protective order and reversed the assault conviction. The tape found on appeal to have been improperly excluded from evidence in *Calabrese* is the same tape that was excluded by the trial court in the case at hand. Its contents are set forth in the majority opinion.

[3] On review, the *Calabrese* court opined that the improper admission of this statement was one of the reasons for reversal.

the defendant guilty of the assault charge. The court concluded that the tape messages were "admissible nonhearsay evidence under § 6-5 of the Connecticut Code of Evidence, under which [t]he credibility of a witness may be impeached by evidence showing bias for, prejudice against, or interest in any person or matter that might cause the witness to testify falsely." (Internal quotation marks omitted.) *State* v. *Calabrese*, supra, 279 Conn. 410. The court concluded: "We can think of no better evidence of animus that might show a motive for making false allegations than the threats of seeking the arrest of the defendant if he did not comply with her wishes, and other invectives, contained in the messages that the trial court improperly excluded from the jury's consideration." Id. The court also commented in a footnote that, in regard to the state's claim that the messages had not been time-stamped, "the lack of a time reference does not render the messages irrelevant as evidence of the complainant's ill feelings about the defendant." Id., 411 n.19.[4]

Having decided that the court abused its discretion in excluding the messages, the *Calabrese* court then analyzed whether the trial court's ruling was harmful by examining whether the jury's verdict was "substantially swayed by the error" and concluded that the court can only find a nonconstitutional evidentiary error to be harmless when the court, on review, "has a fair assurance that the error did not substantially affect the verdict." (Internal quotation marks omitted.) Id., 411–12.

---

[4] The majority apparently believes that this footnote dictates the admissibility of the tape for all time. I cannot conclude that the Supreme Court intended its comment to have an eternal effect. Rather, I read the footnote as suggesting that the lack of a precise time date on the tape does not render it inadmissible where it is plain from the record that the messages were left on the defendant's answering machine on an uncertain date or dates in October, 2002. To conclude otherwise, as apparently the majority does, ignores the basic tenet that the determination of relevance is a fact bound inquiry.

To apply this analytical paradigm to the facts then at hand, the court opined that a reviewing court should "consider a number of factors, namely, the overall strength of the state's case, the impact of the improperly admitted or excluded evidence on the trier of fact, whether the proffered evidence was cumulative, and the presence of other evidence corroborating or contradicting the point for which the evidence was offered." Id., 412. The *Calabrese* court concluded from its search of the trial record that the only evidence regarding the assault charge consisted of hearsay statements by the complainant, including one improperly admitted, and, accordingly, the court opined, the complainant's credibility was "central to the state's case." Id. The court concluded that "the recorded messages provide an untainted source for the jury to understand the animus between the complainant and the defendant, and the resulting bias that might have attached to her statements that were admitted as hearsay evidence." Id., 412–13. Accordingly, the court reversed the defendant's assault conviction.

The present case is not a reprise of *Calabrese*. A searching review of the trial record of the case at hand reveals several significant factual differences, which, I believe, negate the relevance of these 2002 messages. Unlike *Calabrese*, here, the state's case did not rely on statements made by the victim. Unlike *Calabrese*, there was independent evidence of the defendant's guilt of burglary and assault. Indeed, much of the inculpatory evidence on both charges came directly from the defendant's testimony. Because our review is fact bound, I believe that close scrutiny of the record is key to a reasoned analysis.

As to the burglary conviction, the practical effect of the testimony of both the defendant and the victim is that the defendant entered the victim's home without license or permission. Although the victim claimed that

the doors were locked and the defendant must have entered by a window and the defendant claimed that he entered through the unlocked kitchen door, these factual differences regarding the precise manner of entry are not relevant to the burglary conviction because the defendant admitted that he entered the victim's home without her permission. The defendant testified that he called the victim three times from his home to tell her that he wanted to come to her house to get some of his money, that she hung up on him the second time and that the telephone was off the hook on his third call. He then walked toward her home. He stated that as he approached the house he noticed that the rear part, including the kitchen and dining room, was dark but that there was a light in the living room in the front of the house. He knocked on the window, and "when [the victim] appeared and she knew what [he] was there for . . . she didn't really say anything but she indicated no by shaking her head that she wasn't going to let [the defendant] in and that she was not going to give [him] money." The defendant indicated that after a few more minutes, he went to the still-darkened back of the house where he knocked on the dining room window to no avail. He then turned the knob on the back door and, finding it unlocked, walked through the door into the house. The defendant testified: "I'll be frank with you, she looked surprised to see me. I think that she—that she unlocked the back door unwittingly and that's how I was able to walk through, and she looked surprised."

On cross-examination, the prosecutor asked about entry into the house, stating: "Okay. And you testified today that your mother wouldn't let you in the house; correct?" to which the defendant responded, "I guess so, yes, I did." The defendant's testimony, alone, satisfies the first prong of the burglary statute, which makes it a criminal violation to enter or to remain in a premise

when "the actor is not otherwise licensed or privileged to do so." General Statutes § 53a-100 (b).[5]

The second prong of the burglary statute requiring proof that the actor either entered or remained on the premises with the intent to commit a crime is satisfied by evidence that the defendant did, in fact, assault the victim once he gained access to her home. Evidence sufficient to convict the defendant of assault came from him, from police officers and from the victim's *Whelan* statement.[6]

As to the assault conviction, it is noteworthy that unlike the facts of *Calabrese*, the defendant was present with the victim when the police arrived at her home.[7] Thus, there was no doubt as to the identity of the individual with whom the victim had an encounter. It also is significant that the defendant acknowledged that he had taken hold of the victim's arm after she had gone into the bathroom to avoid him once she realized that he had gained access to the house. Here, the defendant's testimony, coupled with the observations of the police officer, provides more corroboration than rebuttal to

---

[5] The defendant claims that he was licensed to enter the house by operation of law because the victim was holding his money which he was entitled to enter the house to retrieve. The majority rejects that claim as legally unfounded. I agree.

[6] See *State* v. *Whelan*, 200 Conn. 743, 753, 513 A.2d 86, cert. denied, 479 U.S. 994, 107 S. Ct. 597, 93 L. Ed. 2d 598 (1986).

[7] In *Calabrese*, the record revealed that the police arrived at the victim's home several hours after the alleged assault. The victim was at home with her husband. On the next day, the police spoke with the victim's son, William Calabrese, who gave a statement regarding the defendant to the police. Interestingly, the *Calabrese* opinion contains a footnote that states that when the police went to the victim's home several months after the alleged assault in conjunction with another related charge, the officer noted that the "complainant had a verbal dispute with William [Calabrese] and seemed angry to see him when he arrived from Stratford." *State* v. *Calabrese*, supra, 279 Conn. 398 n.9. It appears that the court on review may have found it noteworthy that at some point prior to trial, the complainant evinced animus toward another son.

the victim's statement to the police. Although the victim claimed that the defendant had grabbed her arm and dragged her from the bathroom, the defendant, on the other hand, minimized his action, claiming that he simply placed his hand on her arm to lead her from the bathroom to answer the telephone. He acknowledged, however, that when he placed his hand on the victim's arm, she may have lost her balance and fallen against him causing her hair to become disheveled. Even though this testimony was offered in response to the victim's *Whelan* statement that the defendant had dragged her by the hair, the fact that the defendant claimed that the victim may have lost her balance and fallen against him when he allegedly placed his hand on her arm to get her to answer the telephone is supportive of her statement that he grabbed her and inconsistent with his claim that he merely placed his hand on her arm so as to lead her to the telephone.[8]

Additionally, Branford police Officer Jomo Crawford was a first responder to the victim's 911 call. He testified that when he arrived at the victim's home, he saw the victim walking toward his cruiser, that her hair seemed to be out of place and that "[s]he was holding her left arm as if she was in pain and she was walking at a rapid pace." This independent testimony corroborates the victim's *Whelan* statement regarding the defendant's assaultive behavior causing pain to her arm.

Finally, I note that unlike *Calabrese*, in which the complainant did not testify and the state's case was built entirely on her hearsay statements, here, she testified before the jury and, because that testimony was inconsistent with her earlier statement to the police, her statement was admitted for substantive purposes. Thus,

---

[8] It is undisputed that the defendant was trying to get the victim to answer the telephone as he believed that it was the police calling in response to the emergency 911 call she had made before going into the bathroom. His desire was for her to tell the police not to come.

in the case at hand, the jury not only had the opportunity to assess the victim's testimony, but it was given the opportunity to assess her credibility by the display of inconsistencies between her testimony and earlier *Whelan* statement.

In sum, a review of the undisputed facts of the case at hand reveals several differences between the circumstances we face and those of *Calabrese*. Perhaps most noteworthy, the complainant's credibility was central to the state's case in *Calabrese* due to the absence of corroborating evidence; it was not pivotal to the jury's determination of the issues in the case at hand because there was ample corroboration of the state's claims. Therefore, what the court found to be relevant in *Calabrese* does not bind our review, and it is not an aid to our analysis.

If, however, it could reasonably be said that the victim's credibility was a material factor to a disputed issue before the jury, our next point of inquiry must be whether the court's exclusion of the tape was an abuse of discretion. "The credibility of a witness may be impeached by evidence showing bias for, prejudice against, or interest in any person or matter that might cause the witness to testify falsely." Conn. Code Evid. § 6-5. "The range of matters potentially giving rise to bias, prejudice or interest is virtually endless . . . . Because evidence tending to show a witness' bias, prejudice or interest is never collateral . . . impeachment of a witness on these matters may be accomplished through the introduction of extrinsic evidence, in addition to examining the witness directly. . . . The scope and extent of proof through the use of extrinsic evidence is subject to the court's discretion, however . . . and whether extrinsic evidence may be admitted to show bias, prejudice or interest without a foundation is also within the court's discretion. . . .

"The offering party must establish the relevancy of impeachment evidence by laying a proper foundation . . . which may be established in one of three ways: (1) by making an offer of proof; (2) the record independently may establish the relevance of the proffered evidence; or (3) stating a good faith belief that there is an adequate factual basis for [the] inquiry. . . . However, otherwise [r]elevant evidence may be excluded if its probative value is outweighed by the danger of unfair prejudice or surprise, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time or needless presentation of cumulative evidence." (Citations omitted; internal quotation marks omitted.) *State* v. *Brown*, 273 Conn. 330, 341–42, 869 A.2d 1224 (2005). "It is a reasonable exercise of judicial discretion to exclude . . . evidence the relevancy of which appears to be so slight and inconsequential that to admit it would distract attention which should be concentrated on vital issues of the case." (Internal quotation marks omitted.) *State* v. *Sanchez*, 75 Conn. App. 223, 251, 815 A.2d 242, cert. denied, 263 Conn. 914, 821 A.2d 769 (2003). Additionally, when such testimony is offered, our courts have held that "[t]he proffering party bears the burden of establishing the relevance of the offered testimony. Unless such a proper foundation is established, the evidence . . . is irrelevant." (Internal quotation marks omitted.) *State* v. *Pratt*, 235 Conn. 595, 605, 669 A.2d 562 (1995). Accordingly, when the defendant attempted to introduce the telephone messages, the court had to exercise discretion whether to permit impeachment by the use of extrinsic evidence.

Applying the appropriate law to the facts at hand, I do not believe that the court abused its discretion in excluding the telephone messages even if they contained minimally relevant information. I look first to the defendant's tender. At the outset, I note that the defendant did not attempt to utilize the taped messages

to impeach the victim's testimony. It was during his direct testimony, after the victim had already testified on his behalf, that the defendant offered the messages into evidence. The basis of his claim was that the messages bore directly on her credibility. Thus, at this juncture in the trial, after the victim had already testified and during the defendant's testimony one day later, the court was confronted with an offer regarding the victim's credibility, leaving the state no opportunity for redirect examination of the victim if the messages had been admitted. In sum, the defendant chose not to examine the victim in regard to her *Whelan* statement to demonstrate any potential bias, prejudice or interest.

The basis of the defendant's claim of relevance was that the victim was intoxicated when she left the subject messages and during the events leading to the charges at issue. In support of his proffer, the defendant claimed that the victim goes "haywire" and that she is prone to manipulation and to fabrication when she is intoxicated. He claimed that the messages evinced the victim's intoxication and animosity toward him, reflecting bias and interest. The defendant's proffer, however, is premised on the notion that the victim was intoxicated during the evening in question. Other than the defendant's self-serving claim that the victim had been intoxicated, however, the record is bereft of any such evidence. To the contrary, none of the police officers or the paramedic who interacted with the victim at her home that evening testified that she appeared intoxicated. When asked directly by the defendant whether he had noticed any signs of intoxication with respect to the victim, the paramedic who came to the scene in response to a police call for assistance answered in the negative. This evidence provides a stark contrast to the defendant's admission on cross-examination that he had consumed six to seven beers between 4 p.m. and 11:30 p.m. on the day in question. The defendant's

admission of drinking casts doubt on the accuracy of his recollection of the events as well as his observations of the victim's condition. Under these circumstances, and because the defendant's claim of relevance was premised on the notion that the victim was intoxicated both when leaving the telephone messages and during the evening of his arrest, I believe the court was well within its discretion in excluding the tape.

Finally, even if it could be said that the court abused its discretion in excluding the taped messages, I do not believe that we can reasonably conclude, on review, that the exclusion substantially swayed the jury's verdict. This analysis requires us to consider the effect of the court's ruling on the jury's decision, and, as noted in *Calabrese*, in making this assessment, "we consider a number of factors, namely, the overall strength of the state's case, the impact of the improperly admitted or excluded evidence on the trier of fact, whether the proffered evidence was cumulative, and the presence of other evidence corroborating or contradicting the point for which the evidence was offered." *State* v. *Calabrese*, supra, 279 Conn. 412. Performing this analysis in *Calabrese*, the court observed: "The only evidence in the record on the assault charge consisted of hearsay statements by the complainant made to the police, paramedics and medical personnel at Yale-New Haven Hospital, at least one of which the state concedes was improperly admitted. . . . Thus, the jury's perception of the complainant's credibility was central to the state's case." (Citation omitted.) Id. Unlike *Calabrese* and as noted herein, the victim's credibility was not central to the state's case in the matter at hand, and, accordingly, the exclusion of the tape cannot reasonably be said to have swayed the jury.

Also, unlike *Calabrese*, the victim in the case at hand testified and was available for cross-examination. In fact, the victim generally testified favorably for the

defendant, creating contradictions between her testimony and her *Whelan* statement. As a consequence, her credibility and lack of consistency was on vivid display for the jury. As to the relative strength of the cases, although it is evident that the assault conviction in *Calabrese* hung on the slender reed of the complainant's uncorroborated hearsay statements, the jury's finding of guilt in the present case finds support not merely in the victim's statements, but also in the observations of police officers and a paramedic and, significantly, the defendant's inculpatory testimony. Finally, the jury was presented with documentary evidence in the form of a letter written by the defendant to the victim discouraging her from attending and testifying at his trial, evidence the court properly charged the jury as consciousness of guilt.

For the reasons stated, I would affirm the court's judgment of conviction. Accordingly, I respectfully concur in the court's affirmance of the defendant's conviction of interfering with an officer and dissent from the court's reversal of the judgment of conviction of assault of an elderly person in the third degree and burglary in the second degree.