******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# STATE OF CONNECTICUT *v.* CESAR A. OLIVERO
## (AC 42991)

Cradle, Suarez and Harper, Js.

*Syllabus*

Convicted, after a jury trial, of the crime of assault in the first degree in connection with his attack on H with a handsaw, the defendant appealed to this court. The defendant lived in a condominium owned by K, with whom the defendant had a relationship. Approximately two weeks before the assault on H, the relationship between the defendant and K became strained and the defendant began staying with his mother. However, the defendant retained keys to the condominium, kept personal belongings there, and went to and from the condominium at will. The night prior to the assault, in a series of text messages between K and the defendant, K asked the defendant to return his keys and indicated to him that he was no longer allowed to live there. The next night, K went out for dinner and drinks with H, an acquaintance she met a few months earlier and with whom she had exchanged text messages. They returned to the condominium so H could wait for his car service. H and K were unaware that the defendant was in the condominium. When H exited the bathroom in the condominium, the defendant attacked him with a handsaw, severely injuring him. The defendant was charged with assault in the first degree, burglary in the first degree, and home invasion. Prior to trial, the court denied the defendant's request to present the testimony of K and himself in support of his motion to dismiss the charges of burglary in the first degree and home invasion. The trial court denied the motion to dismiss. At trial, the jury was unable to reach a unanimous verdict on the first degree burglary and home invasion charges and the court declared a mistrial as to those charges. *Held*:

1. The trial court properly denied the defendant's pretrial motion to dismiss the first degree burglary and home invasion charges: contrary to the defendant's claim that there was insufficient evidence to establish that the defendant had unlawfully entered or remained in the condominium, the proffered proof, viewed in the light most favorable to the state, warranted a person of reasonable caution to believe that the defendant unlawfully entered the condominium, as required for a conviction of first degree burglary and home invasion; moreover, a fact finder could reasonably find that whatever privilege the defendant previously held to enter K's condominium was expressly and clearly revoked by K on the day prior to the incident via the text messages she sent to the defendant in which she asked him to return his keys and informed him that he did not live there anymore; furthermore, although the defendant claimed that he retained his privilege to enter the condominium because, inter alia, he still had keys to the condominium and kept his personal belongings there, the text messages sent by K on the day prior to the incident illustrated that the defendant was no longer permitted to enter the condominium, and it was undisputed that he entered it on the night of the incident.

2. The trial court did not abuse its discretion in denying the defendant's requests to present testimony in support of his pretrial motion to dismiss the first degree burglary and home invasion charges because there was no factual dispute between the defendant and the state to warrant the evidentiary testimony of the defendant and K: it was clear from the parties' representations at the hearing on the motion that they agreed on 95 percent of the relevant factual predicate to the defendant's motion, which claimed that the facts themselves were insufficient to support the first degree burglary and home invasion charges against the defendant; moreover, because defense counsel provided a full and detailed proffer of the testimony he requested to present, which the state mostly accepted as true, a full evidentiary hearing to iterate those same facts would have been superfluous; furthermore, the defendant did not identify on appeal, how, if at all, his testimony or the testimony of K would have supplemented or been different from the proffer articulated by defense counsel, and therefore, the defendant failed to demonstrate that, even if the

court's ruling was incorrect, he was harmed by the ruling.

3. The defendant could not prevail on his unpreserved claim that the trial court judge improperly failed to disqualify himself from presiding over the defendant's trial because the judge was actually biased against him on the basis of the judge's use of the term "victim" to refer to H in various pretrial hearings and because the judge's denial of his motion to dismiss established the appearance of bias: the judge's use of the term "victim" in pretrial hearings did not objectively establish that he was actually biased against the defendant so as to constitute a due process violation depriving the defendant of a fair trial, the judge's reference to H as "victim" was not critical or hostile to the defendant, as the judge used the term victim merely to identify H, who indisputably sustained significant physical injuries as a result of the defendant's conduct, the judge did not refer to H as a victim in front of the jury, and the judge's use of the term did not establish that he had predetermined the defendant's guilt prior to the start of trial, nor did it reflect on the strength of the state's case or the defendant's claim of self-defense; moreover, the judge's use of the term could not support a claim of actual bias as the term was not derived from an extrajudicial source, but from judicial proceedings, and did not reveal a high degree of antagonism so as to make a fair judgment impossible, and the defendant cited no conduct by the judge during the trial that suggested that he conducted the trial in a way that was biased against the defendant; furthermore, this court declined to review the defendant's unpreserved claim that the judge's denial of his motion to dismiss was sufficient to establish the appearance of bias because a claim of judicial bias based solely on the appearance of partiality was not of constitutional dimension.

4. The defendant could not prevail on his unpreserved claim that the trial court violated his confrontation clause rights by improperly restricting his ability to cross-examine H concerning the content of text messages between H and K in an effort to impeach H's credibility: the defendant, through his defense counsel, abandoned his effort to question H regarding the content of the text messages at trial and, thus, waived his appellate claim; the record sufficiently demonstrated that, although the trial court had granted the state's motion in limine, without prejudice, to preclude the defendant from questioning H as to the content of the messages, defense counsel, at trial, outside the presence of the jury, expressed an intention to question H on the content of those messages, but, the next day, stated that he no longer sought to question H in that regard, and, instead, expressed his intention to question H regarding the volume of the messages, which the trial court permitted, and, ultimately, defense counsel never attempted to question H as to the content of the text messages.

5. The defendant could not prevail on his claim that the prosecutor's use of the term "victim" approximately fourteen times during the evidentiary portion of the trial and in closing argument constituted prosecutorial impropriety that deprived him of his constitutional right to a fair trial: the prosecutor's use of the term "victim" to refer to H was not sufficiently prevalent and chronic so as to be improper, as the number of instances the term was used was not sufficiently excessive in light of the length of the trial, which lasted six days and culminated in approximately 900 pages of transcript, the majority of the prosecutor's use of the term during the evidentiary portion of the trial occurred after witnesses used it for the first time, and the one time defense counsel objected to the prosecutor's use of the term victim, the court sustained the objection, the prosecutor rephrased the question and the prosecutor did not use the term throughout the remaining three days of evidence; moreover, even if this court were to assume that each of these uses of the term "victim" by the prosecutor was improper, the defendant failed to satisfy his burden of demonstrating that those improprieties were so egregious as to amount to a denial of due process, this court having concluded, after applying the factors set forth in *State* v. *Williams* (204 Conn. 523), that the alleged improprieties did not deprive the defendant of a fair trial because, although the alleged improprieties were not invited by defense counsel and no curative instructions were adopted by the trial court, and, although the term victim was central to the critical issue of the case, which was whether H was the victim of assault or an intruder, which supported the defendant's claim of self-defense, the use of the term was infrequent when compared to the length of the trial, the trial court repeatedly instructed the jury during various parts of trial that

counsel's arguments did not constitute evidence, that the jurors were the sole arbiters of credibility, and that the jurors must confine themselves to the evidence in the record, the state's case was strong because there was an abundance of evidence that supported the charge of first degree assault, and, finally, although the jury deliberated for five days, their deadlock was on the unlawful entry element of the first degree burglary and home invasion charges, not on the assault charge.

Argued September 7, 2022—officially released May 30, 2023

*Procedural History*

Substitute information charging the defendant with the crimes of assault in the first degree, burglary in the first degree, and home invasion, brought to the Superior Court in the judicial district of Stamford-Norwalk, where the court, *White, J.*, denied the defendant's motion to dismiss the charges of burglary in the first degree and home invasion; thereafter, the matter was tried to the jury before *White, J.*; verdict of guilty of assault in the first degree; subsequently, the court declared a mistrial as to the charges of burglary in the first degree and home invasion; judgment of guilty, from which the defendant appealed to this court. *Affirmed.*

*Peter G. Billings*, assigned counsel, for the appellant (defendant).

*Denise B. Smoker*, senior assistant state's attorney, with whom, on the brief, was *Paul J. Ferencek*, state's attorney, for the appellee (state).

*Opinion*

HARPER, J. The defendant, Cesar A. Olivero, appeals from the judgment of conviction, rendered after a jury trial, of assault in the first degree in violation of General Statutes § 53a-59 (a) (1).[1] On appeal, the defendant claims that (1) the trial court incorrectly denied his pretrial motion to dismiss the charges of first degree burglary and home invasion, (2) the trial court abused its discretion by denying his requests to present testimony in support of his pretrial motion to dismiss, (3) the trial judge, *White, J.*, improperly failed, sua sponte, to disqualify himself from presiding over the defendant's jury trial because Judge White previously had denied the defendant's motion to dismiss and used the term "victim" in various pretrial hearings, (4) the trial court improperly restricted his ability to cross-examine the victim concerning the content of certain text messages, and (5) the prosecutor's use of the term "victim" during the trial and in closing argument deprived him of his constitutional right to a fair trial.[2] We affirm the judgment of the trial court.

The following facts, which the jury reasonably could have found, and procedural history are relevant to this appeal. The defendant began a relationship with K[3] sometime around 2011, and they have one minor child together, born in 2014.[4] In 2014, the defendant and K moved into K's condominium located in Stamford. On June 14, 2015, two weeks prior to the incident, the defendant and K had a heated argument, which caused them to take a "break" from their relationship. The defendant consequently left K's condominium to reside with his mother in Manhattan.

Also in the spring of 2015, K was seeking employment at a peer-to-peer networking company that employed the victim, Alejandro Herrera. Herrera interviewed K for the position, but the company did not hire her. Nevertheless, Herrera and K stayed in touch via email, and Herrera attempted to help K with other professional opportunities. Although initially their emails were professional, the two then began exchanging text messages that were friendly and social. Then their text messages became, as Herrera described at trial, "fun," "a little flirty," and "racy," which was "inappropriate" because Herrera was married with four children.

On June 25, 2015, the night of the incident, Herrera and K met for dinner at a restaurant in White Plains, New York, at approximately 6 p.m. K informed the defendant that she was going out with her friends, and she did not tell the defendant that she was going to dinner with Herrera because he was married. K asked the defendant to watch their child, but the defendant told her that he could not. Herrera took the train and a cab from his residence in New Jersey to the restaurant, and he had scheduled a car service to pick him up at

8:30 p.m. because they were planning on having a few drinks and his license was suspended in New York due to a pending charge for driving under the influence (DUI). After dinner, Herrera learned that the car service he had scheduled was stuck in traffic in New York, so he and K went to a few more bars in the area. At approximately 10 p.m., K invited Herrera to her condominium so that he could wait for his car service.

On the drive to K's condominium, the defendant repeatedly called K's cell phone. K answered one of the defendant's calls and she told the defendant that she was getting ready to go to bed. After the call ended, the defendant sent K several text messages accusing her of not being home because it sounded to him like K was not indoors and that she was wide awake. The defendant also texted K: "Your very selfish, what goes around comes around," and "[l]augh now, cry later & I won't feel sorry this time."

K and Herrera then arrived at K's condominium, and they parked in the garage on the first floor. Herrera asked to use the bathroom, and K walked with him up the staircase from the garage to the bathroom that was located just at the top of the stairs on the second floor. Herrera used the bathroom for approximately two minutes, and during that time he heard sounds in the condominium that were "indicative of like dishes and water running and like . . . kitchen sounds." Herrera then took one or two steps outside of the bathroom and noticed a light coming from inside the kitchen area, and he could not see K. K asked Herrera if he wanted a drink, which he declined.

K suddenly screamed, "Cesar, no," and Herrera heard a crashing sound that he described at trial as resembling "if somebody had pushed somebody over or knocked somebody over banging and clanking sound." Herrera then felt a violent impact on the top of his head from behind, which caused him to see stars and to buckle. Herrera turned to see the defendant standing in the dark holding a fifteen inch handsaw. The defendant rushed at Herrera and swung the saw with "all his force" and "like a crazy person," hitting Herrera multiple times on the head, face, left shoulder, and hands. While swinging the saw, the defendant shouted, "[t]his is what you get, this is what you get, this is what you get for fucking my girlfriend." Herrera attempted to evade the saw, and to grab the saw, but his hands were "cut in pieces." After three or four minutes, Herrera and the defendant ended up in the kitchen area where the defendant struck the light in the kitchen with the saw, causing glass to shatter everywhere. The defendant eventually dropped the saw, and Herrera, at trial, stated that it was like the defendant "snapped out of a trance, like, it just was like a different person."

K then called 911 and reported that the defendant had attacked Herrera with a saw. Shortly thereafter,

Stamford police officers, including Officer William Mercado and Officer Neals Mira, arrived at the scene and K informed them that her former boyfriend was inside and that he had attacked Herrera with a saw. The police officers apprehended the defendant at the bottom of the stairs to the garage, and they then proceeded up the stairs to find Herrera, who was covered in blood, sitting in a chair in the kitchen. They observed blood on the walls and on the floor of the kitchen, broken glass on the floor, and a bloody handsaw on the table in the dining room. Emergency medical personnel transported Herrera to Stamford Hospital, and he was later transferred to Westchester Medical Center to obtain medical treatment from a hand specialist. Herrera suffered severe injuries and lacerations to his upper body area, arms, head, face, and hands, which required staples, stitches, and five surgeries. Herrera sustained permanent scars, continues to suffer from pain, and he has lost the use of most of the fingers on his right hand.

The defendant subsequently was charged, by way of the state's October 23, 2017 information, with assault in the first degree in violation of § 53a-59 (a) (1), burglary in the first degree in violation of General Statutes § 53a-101 (a) (2), and home invasion in violation of General Statutes § 53a-100aa (a) (2). Following a jury trial on these charges, and five days of jury deliberations, the defendant was found guilty only on the assault charge, and the jury was unable to reach a unanimous verdict on the first degree burglary and home invasion charges. Consequently, the court declared a mistrial as to the first degree burglary and home invasion charges. The court sentenced the defendant to fourteen years of incarceration followed by six years of special parole. This appeal followed. Additional facts and procedural history will be set forth as necessary.

I

The defendant first claims that the court incorrectly denied his pretrial motion to dismiss the first degree burglary and home invasion charges. The defendant argues that the state failed to establish sufficient probable cause for an essential element common to both the first degree burglary and home invasion charges, specifically, that the defendant "enter[ed] or remain[ed] unlawfully" in K's condominium.[5] See General Statutes §§ 53a-101 (a) (2) and 53a-100aa (a) (2). We disagree.

We first set forth the undisputed facts and procedural history relevant to our resolution of this claim. On August 7, 2017, the state filed an information charging the defendant with three counts: assault in the first degree in violation of § 53a-59 (a) (1) (count one); burglary in the first degree in violation of § 53a-101 (a) (3) (count two); and home invasion in violation of § 53a-100aa (a) (2) (count three). Relevantly, in count two, the state charged the defendant with unlawfully entering or remaining in a building at night with the intent to

commit a crime therein, to wit: assault, in violation of § 53a-101 (a) (3). In count three, the state charged the defendant with unlawfully entering or remaining in a dwelling, with the intent to commit a crime therein, to wit: assault, while a person other than a participant in the crime was actually present in such dwelling, and, in the course of committing the home invasion, was armed with a dangerous instrument, in violation of § 53a-100aa (a) (2).[6]

On September 21, 2016, the defendant, pursuant to Practice Book § 41-8 (5), filed a motion to dismiss the first degree burglary and home invasion charges against him on the ground that there was insufficient evidence to support those charges. In his memorandum of law in support of his motion to dismiss, the defendant maintained that a common essential element of both the first degree burglary charge pursuant to § 53a-101 and the home invasion charge pursuant to § 53a-100aa was that he "unlawfully" entered and remained in a dwelling. The defendant argued that he lawfully entered and remained in K's condominium at the time of the incident because he previously had resided there, had a key to the condominium, received mail at the condominium, kept his clothing at the condominium, prepared meals at the condominium, and assisted in providing care for their minor child at the condominium. The defendant attached to his motion screenshots of a series of text messages between K and the defendant on the day prior to the incident. In those messages, K twice asked the defendant to "leave" his set of keys to her condominium, to which the defendant responded, "[i]ts not necessary" and "[w]hy would you want me to leave the keys I still live here?" K responded, "[n]o u don't. Leave them please." The defendant then asked, "[s]o you don't want me here?" K answered, "[n]o. U need to get your shit together. I'm done babysitting."

On August 14, 2017, the court held a hearing on the defendant's motion to dismiss. At the outset of the hearing, the court stated that the parties in chambers had "essentially agreed" on the factual predicate of the defendant's motion to dismiss and, thus, the court requested that the parties "make those representations on the record." Defense counsel agreed with the court's account, and he stated that the parties "were able to agree to about probably 95 percent of the chronology." The court then summarized its understanding of the parties' agreed upon facts as follows: "[K] and the defendant . . . were in a relationship for about a period of five years. They lived together . . . in Stamford. The two had a child together. They had a somewhat volatile relationship. They broke up about two weeks prior to this incident. The . . . address is a condo[minimum] owned by [K]. That the defendant moved out of that address and was living in New York with his mother. And a specific address was mentioned. And the claim is that the defendant was in and out of the [condominium]

during this two week period. He still had a key to the [condominium]. And the claim is that, I guess, a day before this incident there was an exchange of text messages between the defendant and [K], and in that exchange [K] asked this defendant to return the house key. And he never did."

Defense counsel responded that the court's recitation was "correct," but "incomplete." Defense counsel thus made a series of requests to present to the court the testimony of K and the defendant, which he represented was necessary for context. The court did not initially rule on the defendant's requests to present testimony but, instead, invited defense counsel to make a proffer as to the substance of the testimony he intended to present. Defense counsel then described the expected testimony of K and the defendant as follows. The relationship between the defendant and K began ten years prior to the incident, and they had been cohabitating at three separate addresses for five years prior to the incident. Five days prior to the incident and the day prior to the incident, the defendant visited the condominium to visit with K, their minor child, K's family, and his friend, and, on those occasions, the defendant "came and went from the apartment . . . on his own."[7] Stored throughout the condominium were the defendant's personal belongings, including his clothes, computer, books and records, music equipment, and a sofa bed. During the two weeks prior to the incident, the defendant slept on the sofa at his mother's apartment in Manhattan, and he returned to K's condominium "of his own free will" for changes of clothing, laundry, and to pick up and drop off his personal belongings. At some uncertain point during those same two weeks, K invited the defendant "to come back into" the condominium.

In response, the state represented that it did not dispute "most" of defense counsel's proffer, and, more specifically, that it did not dispute what happened in the two weeks prior to the incident, the day before the incident, or the fact that the defendant's clothes remained at the condominium. The state's argument instead focused on the events just prior to the incident, including K's text messages to the defendant on the day prior to the incident in which K, the owner of the condominium, clearly communicated to the defendant that he should return his keys and that he no longer lived at the condominium.

After hearing both parties' arguments as to whether the agreed upon facts were sufficient to support the first degree burglary and home invasion charges, the court orally denied the defendant's motion to dismiss. The court reasoned that, even crediting the entirety of the defendant's proffer, there was sufficient evidence to support the conclusion that the defendant unlawfully entered and remained in K's condominium on the night

of the incident, so as to warrant presenting that question of fact to the jury. The court also did not permit the defendant to present testimony, reasoning that there was no "real dispute between the state and the defense" as to the facts.[8]

We next set forth the standard of review and relevant legal principles governing our review of this claim. "The standard to be applied in determining whether the state can satisfy this burden in the context of a pretrial motion to dismiss under General Statutes § 54-56[9] and Practice Book § 41-8 (5)[10] is no different from the standard applied to other claims of evidentiary sufficiency. . . . When assessing whether the state has sufficient evidence to show probable cause to support continuing prosecution [following a motion to dismiss under § 54-56], the court must view the proffered proof, and draw reasonable inferences from that proof, in the light most favorable to the state. . . . The quantum of evidence necessary to [overcome a motion to dismiss] . . . is less than the quantum necessary to establish proof beyond a reasonable doubt at trial . . . . In [ruling on the defendant's motion to dismiss], the court [must] determine whether the [state's] evidence would warrant a person of reasonable caution to believe that the [defendant had] committed the crime." (Citations omitted; footnotes added; footnote omitted; internal quotation marks omitted.) *State* v. *Pelella*, 327 Conn. 1, 18–19, 170 A.3d 647 (2017). We exercise plenary review over the court's decision to deny the defendant's motion to dismiss. Id., 9–10; see also *State* v. *Cyr*, 291 Conn. 49, 56, 967 A.2d 32 (2009).

The parties agree that a common essential element for both first degree burglary pursuant to § 53a-101 and home invasion pursuant to § 53a-100aa is that the state must prove that the defendant "enters or remains unlawfully" in K's condominium. "A person 'enter[ed] or remain[ed] unlawfully' in or upon premises when the premises, at the time of such entry or remaining, are not open to the public and when the actor is not otherwise licensed or privileged to do so." General Statutes § 53a-100 (b). "To enter unlawfully means to accomplish an entry by unlawful means, while to remain unlawfully means that the initial entering of the building . . . was lawful but the presence therein became unlawful because the right, privilege or license to remain was extinguished." (Internal quotation marks omitted.) *State* v. *Weaver*, 85 Conn. App. 329, 342, 857 A.2d 376, cert. denied, 271 Conn. 942, 861 A.2d 517 (2004). "A license in real property is defined as a personal, revocable, and unassignable privilege, conferred either by writing or parol, to do one or more acts on land without possessing any interest therein. . . . Generally, a license to enter premises is revocable at any time by the licensor. . . . It is exercisable only within the scope of the consent given. . . . The term, privilege, is more general. It is a right or immunity granted

as a peculiar benefit, advantage, or favor; special enjoyment of a good or exemption from an evil or burden; a peculiar or personal advantage or right esp[ecially] when enjoyed in derogation of common right; prerogative. . . . The phrase, licensed or privileged, as used in [our burglary statutes], is meant as a unitary phrase, rather than as a reference to two separate concepts."[11] (Emphasis omitted; internal quotation marks omitted.) *State* v. *Marsan*, 192 Conn. App. 49, 56, 216 A.3d 818, cert. denied, 333 Conn. 939, 218 A.3d 1049 (2019); see also *State* v. *Ashby*, 336 Conn. 452, 489, 247 A.3d 521 (2020). "Whether an entry on premises is 'unlawful' within the meaning of . . . § 53a-100 (b) is a question of fact for the jury." *State* v. *Grant*, 6 Conn. App. 24, 31, 502 A.2d 945 (1986).

For instance, the state can sufficiently establish that a defendant unlawfully entered a private residence if there is evidence that the resident or owner of the residence informs a defendant that he or she is not permitted inside the home. See, e.g., *State* v. *Kyle A.*, 212 Conn. App. 239, 252, 74 A.3d 896 (evidence at trial was sufficient to establish that defendant unlawfully entered home because defendant was not residing at home on date of incident, resident of home previously had communicated to defendant that he was not permitted to enter home, and defendant forcibly had entered home without obtaining permission from resident), cert. granted, 343 Conn. 930, 281 A.3d 1187 (2022); *State* v. *Calabrese*, 116 Conn. App. 112, 124, 975 A.2d 126 (evidence at trial was sufficient to establish that defendant unlawfully entered home because owner of house twice told defendant not to come to house, yet defendant entered house despite owner "having made it quite clear that he was not welcome"), cert. denied, 293 Conn. 933, 981 A.2d 1076, and cert. denied, 293 Conn. 933, 981 A.2d 1076 (2009).

Applying the foregoing, we conclude that the court properly denied the defendant's motion to dismiss because the proffered proof, viewed in the light most favorable to the state, would warrant a person of reasonable caution to believe that the defendant unlawfully entered the condominium, as required for a conviction of first degree burglary and home invasion. Specifically, a fact finder could reasonably find that whatever license or privilege the defendant once had to enter K's condominium was *revoked* by K on the day prior to the incident. A fact finder could reasonably find that the facts supporting the defendant's argument—including that he retained a key to the condominium, had his possessions there, resided there up until two weeks prior to the incident, and visited several times during the two weeks prior to the incident—were vitiated by K's text messages to the defendant on the night prior to the incident. After the occurrence of all these events; see footnote 7 of this opinion; a fact finder reasonably could find that the defendant's license or privilege to enter the

condominium was expressly and clearly revoked by K through her text messages exchanged with the defendant on the night prior to the incident. In those messages, K twice asked the defendant to return his set of keys to her condominium, and twice informed the defendant that he did not live at her condominium anymore. K's statements made it quite clear to the defendant that he was not permitted to enter the condominium, yet, despite these statements, it was undisputed that the defendant entered the condominium on the night of the incident. As in *State* v. *Kyle A.*, supra, 212 Conn. App. 252, and *State* v. *Calabrese*, supra, 116 Conn. App. 124, the communication by the resident of the dwelling to the defendant that he was not permitted to enter is sufficient to establish that the defendant unlawfully entered the dwelling. Therefore, we conclude that the court properly denied his pretrial motion to dismiss the first degree burglary and home invasion charges because a fact finder could reasonably find that the defendant entered K's condominium unlawfully.

II

The defendant next claims that the court abused its discretion by denying his requests to present testimony in support of his pretrial motion to dismiss. Specifically, he argues that the court should have permitted defense counsel to present to the court the testimony of the defendant and K "to ensure [that] the state had sufficient probable cause on the home invasion and burglary charges . . . ." We disagree.

We first set forth the standard of review and relevant legal principles governing our review of this claim. Our Supreme Court "consistently [has] held that, unless otherwise required by statute, a rule of practice or a rule of evidence, whether to conduct an evidentiary hearing generally is a matter that rests within the sound discretion of the trial court." (Internal quotation marks omitted.) *State* v. *Michael J.*, 274 Conn. 321, 332, 875 A.2d 510 (2005). The defendant does not claim that an evidentiary hearing was required by a statute, rule of practice, or rule of evidence; thus, we review the court's decision not to hear testimony for an abuse of discretion. "In determining whether there has been an abuse of discretion, every reasonable presumption should be given in favor of the correctness of the court's ruling. . . . Reversal is required only where an abuse of discretion is manifest or where injustice appears to have been done. . . . Discretion means a legal discretion, to be exercised in conformity with the spirit of the law and in a manner to subserve and not to impede or defeat the ends of substantial justice. . . . It goes without saying that the term abuse of discretion does not imply a bad motive or wrong purpose but merely means that the ruling appears to have been made on untenable grounds." (Internal quotation marks omitted.) *Wheeler* v. *Beachcroft, LLC*, 210 Conn. App. 725, 757, 271 A.3d

141 (2022).

As explained in part I of this opinion, the defendant filed a pretrial motion to dismiss the first degree burglary and home invasion charges against him on the ground that there was insufficient evidence to establish that he had unlawfully entered or remained in the condominium. At the hearing on the motion, the court stated that the parties in chambers had "essentially agreed" on the factual predicate of the defendant's motion to dismiss and, thus, the court requested that the parties "make those representations on the record." Defense counsel stated that the parties "were able to agree to about probably 95 percent of the chronology." The court then summarized its understanding of the parties' agreed upon facts, and the defendant responded that the court's recitation was "correct" but "incomplete." Defense counsel thus made a series of requests to present to the court the testimony of K and the defendant, which he represented was necessary for context.[12] The court did not initially rule on the defendant's requests to present testimony but, instead, asked defense counsel to make a proffer as to the substance of the testimony he intended to present. Defense counsel then provided the court with a description of the expected testimony of K and the defendant. Afterward, the state represented that it did not dispute "most" of defense counsel's proffer, and, more specifically, that it did not dispute what happened in the two weeks prior to the incident, the day before the incident, or the fact that the defendant had his clothes at the condominium. Given the absence of any "real dispute between the state and the defense" as to the facts, the court ultimately denied the defendant's requests to present testimony.

On the basis of the foregoing, we conclude that the court did not abuse its discretion by denying the defendant's requests to present testimony in support of his pretrial motion to dismiss. It was clear from the parties' representations at the hearing that there was no factual dispute between the parties because they had agreed on 95 percent of the predicate facts. Rather, the issue presented was whether those facts were sufficient to support the first degree burglary and home invasion charges against the defendant. In light of the fact that defense counsel provided a full and detailed summary of the testimony he requested to present, which the state mostly accepted as true, a full evidentiary hearing to iterate those same facts would have been superfluous. Indeed, the defendant on appeal does not identify how, if at all, his testimony or the testimony of K would have supplemented or been different from the proffer articulated by defense counsel. The defendant, therefore, has failed to demonstrate that, even if the court's ruling was incorrect, he was harmed by the ruling. Under these circumstances, the defendant has not demonstrated that the court abused its discretion by denying

his requests to present testimony in support of his motion to dismiss.

## III

The defendant next claims that Judge White improperly failed, sua sponte, to disqualify himself from presiding over his jury trial because Judge White previously had denied the defendant's motion to dismiss and, when referring to Herrera, used the term "victim" in various pretrial hearings. Specifically, the defendant argues that, although "[t]here is no statute or rule that expressly prohibits a judge who finds probable cause against a particular defendant from later presiding at that defendant's trial," Judge White's failure to disqualify himself deprived the defendant of his constitutional right to a fair trial. The defendant's claim has two parts. First, he argues that Judge White's use of the term "victim" approximately twenty-four times in eleven different pretrial hearings established that Judge White *actually was biased* against him. Second, he argues that Judge White's denial of his motion to dismiss was sufficient to establish the *appearance of bias*. We disagree.

At the outset, the defendant concedes that this claim is unpreserved because he failed to seek the disqualification of Judge White in the trial court, and requests review pursuant to the standards set forth in *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), as modified by *In re Yasiel R.*, 317 Conn. 773, 781, 120 A.3d 1188 (2015). Pursuant to *Golding*, "a defendant can prevail on a claim of constitutional error not preserved at trial only if *all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation . . . exists and . . . deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt." (Emphasis in original; footnote omitted.) *State* v. *Golding*, supra, 239–40; see *In re Yasiel R.*, supra, 781 (modifying third prong of *Golding*).

The defendant asserts, and the state agrees, that the entirety of the defendant's claim satisfies the first two prongs of *Golding*. We disagree that the entirety of the judicial bias claim is reviewable under *Golding*. We agree with both parties that the defendant's actual bias claim satisfies the first two prongs of *Golding* and, thus, is reviewable. Particularly, the record is adequate to review the defendant's actual bias claim because the record contains the transcripts reflecting Judge White's use of the term "victim"; see *State* v. *Milner*, 325 Conn. 1, 10, 155 A.3d 730 (2017); and actual bias rises to the level of a constitutional violation. See *State* v. *Cane*, 193 Conn. App. 95, 133 n.33, 218 A.3d 1073, cert. denied,

334 Conn. 901, 219 A.3d 798 (2019). In contrast with the parties, we conclude that the defendant's appearance of bias claim fails the second prong of *Golding* and, thus, is not reviewable because a claim of judicial bias based solely on the appearance of partiality is not of constitutional dimension. See id.; *State* v. *Stanley*, 161 Conn. App. 10, 32–33, 125 A.3d 1078 (2015), cert. denied, 320 Conn. 918, 131 A.3d 1154 (2016). Accordingly, we turn our focus to determine whether the defendant's actual bias claim satisfies the third prong of *Golding*.

"A claim of judicial bias is a very serious matter." *State* v. *Carlos C.*, 165 Conn. App. 195, 206, 138 A.3d 1090, cert. denied, 322 Conn. 906, 140 A.3d 977 (2016). "The United States Supreme Court consistently has held that a judge's failure to disqualify himself or herself will implicate the due process clause only when the right to disqualification arises from actual bias on the part of that judge. . . . [M]ost questions concerning a judge's qualifications to hear a case are not constitutional ones, because the [d]ue [p]rocess [c]lause of the [f]ourteenth [a]mendment establishes a constitutional floor, not a uniform standard. . . . Instead, these questions are, in most cases, answered by common law, statute, or the professional standards of the bench and bar. . . . But the floor established by the [d]ue [p]rocess [c]lause clearly requires a fair trial in a fair tribunal . . . before a judge with no actual bias against the defendant or interest in the outcome of his particular case. . . . [C]ertainly *only in the most extreme of cases* would disqualification on [the basis of allegations of bias or prejudice] be constitutionally required . . . ." (Emphasis added; internal quotation marks omitted.) *State* v. *Stanley*, supra, 161 Conn. App. 32. "Accusations of judicial bias or misconduct implicate the basic concepts of a fair trial. . . . [A] claim of judicial bias strikes at the very core of judicial integrity and tends to undermine public confidence in the established judiciary. . . . No more elementary statement concerning the judiciary can be made than that the conduct of the trial judge must be characterized by the highest degree of impartiality. If [the judge] departs from this standard, he [or she] casts serious reflection upon the system of which [the judge] is a part." (Internal quotation marks omitted.) *State* v. *Cane*, supra, 193 Conn. App. 133.

"The standard to be employed is an objective one, not the judge's subjective view as to whether he or she can be fair and impartial in hearing the case." (Internal quotation marks omitted.) Id., 133–34; see also *Rippo* v. *Baker*, 580 U.S. 285, 287, 137 S. Ct. 905, 197 L. Ed. 2d 167 (2017) ("[r]ecusal is required when, objectively speaking, 'the probability of actual bias on the part of the judge or [decision maker] is too high to be constitutionally tolerable' "). "[J]udicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge.

They may do so if they reveal an opinion that derives from an extrajudicial source; and they will do so if they reveal such a high degree of favoritism or antagonism as to make fair judgment impossible." (Internal quotation marks omitted.) *Ponns Cohen* v. *Cohen*, 342 Conn. 354, 363, 270 A.3d 89 (2022).

In the present case, the defendant's actual bias claim is founded on Judge White's use of the term "victim" approximately twenty-four times in various pretrial hearings.[13] He argues that "our [Supreme] Court has frowned upon the prosecutors use of the word 'victim' because the jury could understand that the state was expressing its personal opinion that the defendant had victimized the complainant. *State* v. *Warholic*, 278 Conn. 354, [370] n.7, [897 A.2d 569] (2006). This same reasoning applies to Judge White." He contends that Judge White's use of that term "demonstrates that he already made conclusions about the guilt of the defendant even before starting the trial," and, thus, establishes that Judge White was not impartial.[14]

We conclude that Judge White's use of the term "victim" in pretrial hearings does not objectively establish that he actually was biased against the defendant so as to constitute a due process violation depriving the defendant of a fair trial. Although a prosecutor's repeated use of the term "victim" in front of a jury may be improper under some circumstances; see part V of this opinion; we disagree with the defendant that "this same reasoning" applies to Judge White's use of that term in pretrial proceedings. In *Warholic*, the case cited by the defendant in support of his argument, our Supreme Court "caution[ed] the state . . . against making excessive use of the term 'victim' to describe a complainant when the commission of a crime is at issue because prevalent use of the term may cause the jury to draw an improper inference that the defendant committed a crime against the complainant." *State* v. *Warholic*, supra, 278 Conn. 370 n.7. The reasoning of *Warholic* is inapposite to the present case because the court did not refer to Herrera as the victim in front of the jury.

Furthermore, Judge White's use of the term "victim" does not support the defendant's actual bias claim because it is not critical or hostile to the defendant. *Ponns Cohen* v. *Cohen*, supra, 342 Conn. 363. Instead, Judge White used the term "victim" in pretrial proceedings merely to identify the individual, Herrera, who indisputably sustained significant physical injuries as a result of the defendant's conduct. Judge White's use of the term "victim" does not establish that he predetermined the defendant's guilt prior to starting the trial, and it expresses no definite opinion on the strength of the state's case or the defendant's claim of self-defense. The defendant's argument is further undercut by the fact that defense counsel used the term "victim" three

times during those same pretrial hearings.

Additionally, Judge White's use of the term "victim" does not support his actual bias claim because it neither derived from an extrajudicial source nor revealed a high degree of antagonism to make fair judgment impossible. See *Ponns Cohen* v. *Cohen*, supra, 342 Conn. 363. It was apparent from the outset of the criminal proceeding that Herrera was the individual who sustained injuries as a result of the defendant's conduct and, thus, the court's designation of Herrera as the "victim" stemmed from judicial proceedings, not any extrajudicial source. See *State* v. *Cane*, supra, 193 Conn. App. 137 (court's reference to defendant as "violent" stemmed from defendant's criminal history noted in presentence investigation report). The use of the term "victim" further does not reveal any antagonism by Judge White that would impact his fair judgment. Indeed, as the state aptly notes, it was the duty of the jury, not Judge White, to determine whether the defendant was guilty. See id., 134–35 n.35 (noting that judge's use of term "victims" in pretrial decision "was not indicative of bias" as judge did not refer to "victims in front of the jury" and defendant "subsequently [was] tried by a jury, and not by the court"). The defendant cites no conduct by the court during the trial that would suggest that Judge White conducted the trial in a way that was biased against the defendant.

In light of the foregoing, this is not one of the " 'most extreme of cases' " in which the constitution requires a judge to recuse himself or herself. *State* v. *Stanley*, supra, 161 Conn. App. 32–33. Therefore, we conclude that Judge White did not improperly fail to disqualify himself from presiding over the defendant's trial.

IV

The defendant next claims that the court improperly restricted his ability to cross-examine Herrera concerning the content of certain text messages. Particularly, the defendant contends that the court violated his confrontation clause rights by forbidding him from cross-examining Herrera regarding text messages exchanged between Herrera and K concerning Herrera's "pending DUI at the time of the incident, prior violent behavior . . . and texts that contradicted [Herrera's] testimony to the jury." In response, the state contends, among other things, that the defendant abandoned this claim at trial. We agree with the state.

We first set forth the undisputed facts and procedural history relevant to our resolution of this claim. The defendant's claim regarding the cross-examination of Herrera as to text messages exchanged between Herrera and K stems from the state's October 11, 2017 pretrial motion in limine. In that motion in limine, the state sought to preclude the defendant from introducing certain text messages between Herrera and K on the

ground that those messages constituted improper extrinsic evidence to impeach the credibility of Herrera pursuant to §§ 4-5 and 6-6 of the Connecticut Code of Evidence. The motion specifically sought to exclude, inter alia, two categories of text messages concerning (1) a pending criminal action in New York against Herrera stemming from his DUI arrest, his plea negotiations relating to his DUI, and the fact that he previously had been pulled over approximately four to five times, and (2) Herrera's frustration with his defense counsel in the New York DUI action and his statement that he "was fighting with Jews all day." In the October 11, 2017 motion, the state noted in a footnote that many of the text messages exchanged between Herrera and K were of a sexual nature and were the subject of a separate motion in limine filed on August 7, 2017.

On October 31, 2017, the court heard oral argument on the state's October 11, 2017 motion in limine. The state argued that these text messages should be excluded because the messages have nothing to do with Herrera's credibility and, instead, "simply show that you know perhaps he is a bad person." In response, the defendant argued that the text messages should be admitted to impeach Herrera and to corroborate the defendant's theory that Herrera was a violent person who was intoxicated at the time of the incident. After hearing the parties' arguments, the court orally granted the state's motion in limine, without prejudice, holding that "these texts are essentially texts for purposes of impeaching . . . Herrera's character, saying he's a bad guy, or made some inappropriate or derogatory comments."

On the first day of trial, the state presented the testimony of Herrera. Prior to the start of the defendant's cross-examination of Herrera, and outside the presence of the jury, the parties again addressed the defendant's use of the text messages between Herrera and K. The state asked that defense counsel abide by the court's prior motion in limine ruling as to the admissibility of the text messages, and defense counsel stated that "[t]here's no ruling" and indicated that he intended to question Herrera concerning a set of redacted text messages. The court stated that, in light of Herrera's testimony that his relationship with K was flirtatious, it was going to give the defendant some leeway to cross-examine Herrera on the nature of his relationship with K, and that it would take up the issue of text messages afterward because "we may not even have to go there with the texts." The defendant proceeded to start, but did not finish, his cross-examination of Herrera on the first day of trial, and he did not question Herrera about his text messages with K.[15]

After the close of the first day of evidence and outside the presence of the jury, defense counsel indicated his intention to introduce approximately 600 text messages

between Herrera and K, which had been redacted to "remove any references to the objectionable subject matters, which had been the subject of some motions in limine." Defense counsel stated that the purpose of the text messages was to impeach the credibility of Herrera with respect to his activities on the night of the incident, and the nature of his relationship with K. The state disputed the adequacy of the defendant's redactions because some of the salacious messages that the state moved in limine to exclude had not been redacted. The court marked the text messages for identification as exhibit D and indicated that it would take up the issue before the start of evidence on the next day.

Prior to the start of the second day of evidence and outside the presence of the jury, the court again heard arguments on the defendant's admission of text messages to impeach Herrera. Preliminarily, defense counsel indicated that he no longer intended to offer any specific text messages between Herrera and K. Specifically, defense counsel stated that Herrera's testimony "was circumspect if not outright misleading about the depth of his communications of the volume of his communications. So, my application at this point is simply that I'm not going to offer any of the specific text messages between them. I do want the jury to hear, and I will question him about the volume of text messages in the five day period preceding this transaction. So, I—I think that there may be some problems with his recollection or his accuracy, but I don't foresee independently offering on this witness any of those messages." The state objected to the proposed inquiry concerning the quantity of text messages because it did not "see how the number of text messages between the two of them impeaches anything that . . . Herrera said yesterday." The court stated that, as it previously had indicated, defense counsel could "impeach on credibility but you can't introduce extrinsic evidence," and that it was going to give defense counsel "a little bit of leeway in asking about" the quantity of text messages, but that it was "not going to let you put in the texts. But you said you're not offering them anyway." Defense counsel responded that he was "not making an offer. I'm alerting counsel that I am going to ask this witness about the volume of his text communication in the five day[s] preceding this encounter." Finally, the court stated that it was "going to give the defense some leeway in that regard. But at some point I'm going to say that's enough," and defense counsel responded that he "[u]nderstood."

During the second day of evidence, defense counsel resumed his cross-examination of Herrera. Relevantly, defense counsel asked Herrera: "I think you said there was some texting between you and [K] in a period leading up to [the date of the incident], is that fair?" Herrera responded, "yes." Defense counsel then asked Herrera, "[w]ithout going into what any particular text

said or didn't say, do you recall about how much texting you did with [K] in, say, the five day period leading up to this?" Herrera responded, "I don't recall exactly, but there was a lot of texting," and that he "really would be just guessing" at the volume of text messages.

Defense counsel then asked Herrera three questions regarding the quantity of messages exchanged between himself and K. First, defense counsel asked if it would refresh Herrera's recollection to "look at . . . a tab of the texts . . . that went on between you?" Second, defense counsel asked if it was "fair to say that more than fifteen hundred texts passed between you and [K]?" Third, defense counsel asked whether Herrera could "say with any specificity the number of texts that" passed between him and K. The state objected to the first two questions without specifying the basis for the objection and objected to the third question on the ground of relevancy, and the court sustained each of the state's objections. Defense counsel did not ask any further questions of Herrera regarding his text messages to K.

A threshold issue is whether the defendant preserved this claim. He contends on appeal that defense counsel's "arguments, objections and the court's ruling have preserved this claim for review," and that, alternatively, this claim is reviewable under *Golding*. We disagree with the defendant that he preserved this claim because, as outlined previously, the defendant never attempted to cross-examine Herrera regarding the content of his text messages and did not raise a confrontation clause claim with respect to the scope of Herrera's testimony. Although the defendant previously opposed the state's motion in limine to exclude the text messages on evidentiary grounds, this argument failed to preserve his confrontation clause claim as to the scope of Herrera's testimony. We nevertheless conclude that the first two prongs of *Golding* are met and, thus, turn to *Golding*'s third prong to determine whether the defendant's confrontation clause violation actually occurred and deprived the defendant of a fair trial. See *State* v. *Golding*, supra, 213 Conn. 239–40; see *In re Yasiel R.*, supra, 317 Conn. 781 (modifying third prong of Golding).

We next set forth legal principles of abandonment that govern our resolution of this claim. "It is well settled that a criminal defendant may waive rights guaranteed to him under the constitution. . . . [T]he definition of a valid waiver of a constitutional right . . . [is] the intentional relinquishment or abandonment of a known right. . . . When a party consents to or expresses satisfaction with an issue at trial, claims arising from that issue are deemed waived and may not be reviewed on appeal. . . . Additionally, it is well settled that defense counsel may waive a defendant's sixth amendment right to confrontation." (Internal quotation marks omitted.) *State* v. *Sweet*, 214 Conn. App. 679,

695, 280 A.3d 1243, cert. denied, 345 Conn. 920, 284 A.3d 983 (2022). "A defendant may waive his right of confrontation . . . either expressly or impliedly by his deliberate action." (Internal quotation marks omitted.) *State* v. *Smith*, 289 Conn. 598, 621, 960 A.2d 993 (2008). "Waiver consists of the intentional abandonment or voluntary relinquishment of a known right . . . . [It] involves the idea of assent, and assent is an act of understanding. . . . [W]aiver does not have to be express, but may consist of acts or conduct from which waiver may be implied . . . . In other words, waiver may be inferred from the circumstances if it is reasonable to do so." (Internal quotation marks omitted.) *State* v. *Gaskin*, 116 Conn. App. 739, 753, 977 A.2d 681, cert. denied, 294 Conn. 914, 983 A.2d 851 (2009).

"[W]hen a party abandons a claim or argument before the trial court, that party waives the right to appellate review of such claim because a contrary conclusion would result in an ambush of the trial court . . . ." (Internal quotation marks omitted.) *State* v. *McLaughlin*, 135 Conn. App. 193, 198, 41 A.3d 694, cert. denied, 307 Conn. 904, 53 A.3d 219 (2012). "Our appellate courts frequently have stated that a party may not pursue one course of action at trial for tactical reasons and later on appeal argue that the path he rejected should now be open to him." (Internal quotation marks omitted.) *State* v. *Fuller*, 158 Conn. App. 378, 393, 119 A.3d 589 (2015). "[A] constitutional claim that has been waived does not satisfy the third prong of the *Golding* test because, in such circumstances, we simply cannot conclude that injustice [has been] done to either party . . . or that the alleged constitutional violation . . . exists and . . . deprived the defendant of a fair trial . . . . To reach a contrary conclusion would result in an ambush of the trial court by permitting the defendant to raise a claim on appeal that his or her counsel expressly had abandoned in the trial court." (Internal quotation marks omitted.) *State* v. *Sweet*, supra, 214 Conn. App. 695.

Our review of the record, and in particular the defendant's arguments prior to the second day of evidence, leads us to conclude that the defendant abandoned his earlier effort to question Herrera regarding the content of the text messages at trial and, thus, he has waived this appellate claim.[16] Prior to trial, the court granted, without prejudice, the state's motion in limine to exclude certain text messages between Herrera and K. After the first day of evidence, the defendant, through defense counsel, expressed an intention to question Herrera regarding the content of the subject text messages. Nevertheless, on the morning prior to the second day of evidence, defense counsel made clear that he no longer sought to question Herrera regarding the content of the text messages. Defense counsel expressly stated that he was "not going to offer any of the specific text messages between them," and that he did not "foresee independently offering on this witness any of those

messages." Instead, defense counsel expressed his intention to question Herrera as to the volume of text messages between the defendant and K, and the court permitted him some "leeway" to pursue this avenue of inquiry over the state's objection. Then, during the second day of evidence, defense counsel asked Herrera as to the amount of text messages he exchanged with K, and "[w]*ithout going into what any particular text said or didn't say*, do you recall about how much texting you did with [K] in, say, the five day period leading up to this?" (Emphasis added.) In response, Herrera testified that there was a fair amount of texting between them, but he did not recall the exact amount. In accordance with his prior indications, defense counsel did not ask Herrera regarding the content of the text messages. The defendant, through his counsel, made the decision not to question Herrera regarding the text messages, so he cannot "later on appeal argue that the path he rejected should now be open to him." (Internal quotation marks omitted.) *State* v. *Fuller*, supra, 158 Conn. App. 393. In sum, we conclude that the defendant abandoned this claim and, consequently, it fails the third prong of *Golding*.

V

The defendant finally claims that the prosecutor's use of the term "victim" during the trial and in closing argument deprived him of his constitutional right to a fair trial. The defendant argues that the prosecutor's use of the term "victim" fourteen total times, specifically, nine times during the evidentiary portion of the trial and five times during closing argument, constituted prosecutorial impropriety.[17] We disagree.

We first set forth the undisputed facts relevant to our resolution of this claim. The evidentiary portion of the trial and closing argument spanned six days and culminated in approximately 900 transcript pages. During the evidentiary portion of the trial, the prosecutor used the term "victim" to refer to Herrera on nine occasions, specifically when questioning the law enforcement personnel. On the first day of evidence, Mercado testified on direct examination that when police arrived at the scene, they "found the victim, [Herrera], in the kitchen sitting at a chair." In turn, the prosecutor asked Mercado the following three questions utilizing the term "victim": (1) "Now, while waiting for the EMT or an ambulance, did you . . . and Officer Mira remain with the victim?" (2) "[D]o you recall how many technicians assisted the victim, if you recall?" And (3) "were you there when they were assisting the victim or did you move to another area at the condo?" Also, on the first day of evidence, Officer Fabio Rodriguez testified that his purpose for being dispatched to Stamford Hospital was "[t]o stay with the victim at the hospital." The prosecutor then asked Rodriguez two questions using the term "victim": "What kind of victim?" And, "[d]id you notice

any injuries to [the] victim's—Mr. Herrera's thumb, if you recall?" On the second day of evidence, the prosecutor asked Officer Eva Maldonado, who interviewed K at the Stamford Police Department the day after the incident, whether she was "appraised when you were briefed as to the facts of the case, umm, were you appraised as to who was the victim in the case?" On the third day of evidence, the prosecutor asked Sergeant Adrian Novia three questions using the term "victim": (1) "Now, while on scene, did you actually meet with the assault victim?" (2) "[A]nd where was the assault victim, if you know, when you got on scene?" And (3) "where did you interview [K] after the . . . victim was taken away by the medics?" In response to the second question to Novia, defense counsel objected to the prosecutor's use of the terms "victim" and "assault." The court sustained the objection, and the prosecutor rephrased his question to omit those terms. The prosecutor did not use the term "victim" for the remaining evidentiary portion of the trial. After the conclusion of evidence, the defendant did not move for a mistrial or a new trial alleging prosecutorial impropriety based on the prosecutor's use of the word "victim," nor did he request an instruction to the jury concerning the prosecutor's use of the term.

During closing argument, the prosecutor referred to Herrera as the "victim" on five occasions. In its initial closing argument, the prosecutor stated: "You recall Sergeant Novia's testimony, that on the evening of the assault, after the defendant was taken into custody and after the victim was taken to the hospital, they sat down with [K], and she had calmed down somewhat and she—they asked her a number of questions to explain what she had observed and what had happened." During the state's rebuttal closing argument, the prosecutor stated: "[Y]ou will see . . . that right outside the bathroom there is blood spatter on the wall, consistent with the victim's rendition of facts. You can see it right here. And this is state's exhibit 59. You can see it bigger in the photograph that Officer Rondano said he zoomed in on, you can see the blood spatter on the wall just above the molding, and that's right outside the bathroom. How is the blood evidence inconsistent with the victim's story? There's blood on the wall right outside the bathroom. There is, consistent with the victim's story, blood right outside the banister, you can see, this was blown up. And again, [Officer] Rondano [showed you] the blood drops on the floor. Take a look at this when you're in the deliberation room. What does this show? This supports the victim's story that he was whacked over the head, right outside the bathroom, not in the kitchen."

The court repeatedly instructed the jury—prior to the start of evidence, prior to closing argument, during defense counsel's closing argument, and after the conclusion of closing arguments—that the argument of

counsel does not constitute evidence, that the jurors were the sole arbiters of credibility, and that the jurors must confine themselves to the evidence in the record. Additionally, the prosecutor began his closing argument by reminding the jury that "you are the fact finders in this case. You find the facts, not me, not [defense counsel], not Judge White. Your verdict has to be based on the evidence in the case."

We next set forth the relevant legal principles governing our review of the defendant's claim.[18] "In analyzing claims of prosecutorial impropriety, we engage in a two step analytical process. . . . The two steps are separate and distinct. . . . We first examine whether prosecutorial impropriety occurred. . . . Second, if an impropriety exists, we then examine whether it deprived the defendant of his due process right to a fair trial. . . . In other words, an impropriety is an impropriety, regardless of its ultimate effect on the fairness of the trial. Whether that impropriety was harmful and thus caused or contributed to a due process violation involves a separate and distinct inquiry." (Internal quotation marks omitted.) *State* v. *Hinds*, 344 Conn. 541, 555–56, 280 A.3d 446 (2022); see *State* v. *Johnson*, 345 Conn. 174, 215, 283 A.3d 477 (2022) (defendant has burden to establish both parts of prosecutorial impropriety test).

With respect to the first prong, in *State* v. *Warholic*, 278 Conn. 354, 370, 897 A.2d 569 (2006), our Supreme Court held that a prosecutor's reference to the complainant as the "victim" in closing argument was not necessarily inappropriate because "the jury was likely to understand that the state's identification of the complainant as the victim reflected the state's contention that, based on the state's evidence, the complainant was the victim of the alleged crimes." Our Supreme Court "caution[ed] the state, however, against making excessive use of the term 'victim' to describe a complainant when the commission of a crime is at issue because prevalent use of the term may cause the jury to draw an improper inference that the defendant committed a crime against the complainant." Id., 370 n.7.

Although "[t]here is . . . no mathematical formula that can be applied ritualistically" to this type of claim; *State* v. *Rodriguez*, 107 Conn. App. 685, 702, 946 A.2d 294, cert. denied, 288 Conn. 904, 953 A.2d 650 (2008); our Supreme Court and this court "repeatedly have concluded that a prosecutor's infrequent use of the term 'victim' does not constitute prosecutorial impropriety." *State* v. *Johnson*, supra, 345 Conn. 217; see, e.g., id., 216 (prosecutor's reference to complainant as "victim" on one occasion during examination of witness did not amount to impropriety); *State* v. *Ciullo*, 314 Conn. 28, 55, 59, 100 A.3d 779 (2014) (prosecutor's reference to complainants as "victims" on seven occasions during examination of witnesses in thirteen days of trial and

closing argument was not sufficiently excessive to be improper); *State* v. *Warholic*, supra, 278 Conn. 370 n.7 (prosecutor's reference to complainant as "victim" on two occasions during closing argument did not amount to impropriety); *State* v. *Williams*, 200 Conn. App. 427, 438–39, 238 A.3d 797 (prosecutor's reference to complainant as "victim" on four occasions during closing argument did not amount to impropriety), cert. denied, 335 Conn. 974, 240 A.3d 676 (2020); *State* v. *Kurrus*, 137 Conn. App. 604, 621, 49 A.3d 260 (prosecutor's reference to complainant as "victim" on three occasions during closing argument did not amount to impropriety), cert. denied, 307 Conn. 923, 55 A.3d 566 (2012); *State* v. *Rodriguez*, supra, 107 Conn. App. 701, 703 (prosecutor's sporadic use of term "victim" during closing argument did not amount to impropriety).

"On the other hand, when a prosecutor's references to a complainant as a 'victim' are 'prevalent and chronic, [our appellate courts] have determined that such references have invaded the propriety of the trial proceeding.' " *State* v. *Johnson*, supra, 345 Conn. 217; see, e.g., *State* v. *Thompson*, 146 Conn. App. 249, 270–72, 76 A.3d 273 (prosecutor's use of term "victim" on seven occasions during examination of witnesses and closing argument, each of which was subject to timely defense objection that court promptly sustained without opposition by state, constituted impropriety), cert. denied, 310 Conn. 956, 81 A.3d 1182 (2013); *State* v. *Albino*, 130 Conn. App. 745, 766, 24 A.3d 602 (2011) (when there was challenge as to whether crime occurred, prosecutor's reference to complainant as "victim" on twenty-seven occasions during examination of witnesses, in conjunction with twelve references to killing as "murder" and six references to firearm as "murder weapon," constituted impropriety), aff'd, 312 Conn. 763, 97 A.3d 478 (2014).

Although we iterate our caution that the state should refrain from making excessive use of the term "victim" to describe a complainant when the commission of a crime is at issue, we conclude that the prosecutor's use of the term "victim" to refer to Herrera was not sufficiently prevalent and chronic so as to be improper.[19] The prosecutor's fourteen uses of that term were not sufficiently excessive particularly in light of the fact that the evidentiary portion of the trial and closing argument spanned six days and culminated in approximately 900 transcript pages. Additionally, the majority of the prosecutor's use of the term "victim" during the evidentiary portion of the trial occurred after the witnesses first used the term. With the exception of these fourteen occurrences, the prosecutor consistently referred to Herrera by his name, his pronouns (he/his/him), and as an "individual." During the evidentiary portion of the trial, the prosecutor only used the term "victim" on the first three days, and the prosecutor did not use that term to question any of the witnesses after

the court sustained defense counsel's objection to the use of the terms "assault" and "victim." During closing argument, the prosecutor's use of the term "victim" was not improper because the jury would understand that it was based on evidence presented and on the state's argument that the defendant had committed the crimes charged. See *State* v. *Rodriguez*, supra, 107 Conn. App. 703 (use of word "victim" by prosecutor during closing argument was nothing more than permissible rhetorical device, based on state's view of evidence).

Furthermore, the prosecutor's use of the term "victim" did not rise to the level of egregiousness that this court has determined to be improper in *Thompson* and *Albino*. In *State* v. *Thompson*, supra, 146 Conn. App. 270–72, this court held that the prosecutor's use of the term "victim" on seven occasions during examination of the witnesses and in closing argument, each of which was subject to a timely defense objection that the court promptly sustained without opposition by the state, was improper. More specifically, this court rejected the state's "argument that such references were not improper because there were too few of them to constitute excessive use, within the meaning of *Warholic*, ignores the important distinguishing fact that the trial court had repeatedly ruled them to be improper and instructed the prosecutor not to use them, yet the prosecutor, unaccountably even to herself, could not restrain herself from repeating them." Id., 271. Here, unlike in *Thompson*, the court never ruled that the use of the term "victim," by itself, was improper, never instructed the prosecutor not to use the term, and the prosecutor did not continue to use the term in violation of the court's rulings. Instead, there was only one objection by defense counsel to the prosecutor's use of the terms "assault" and "victim," the court sustained the objection, the prosecutor rephrased the question, and the prosecutor did not use the terms throughout the remaining three days of evidence.

In *State* v. *Albino*, supra, 130 Conn. App. 766, this court held that the prosecutor's reference to the complainant as "victim" on twenty-seven occasions during the examination of witnesses, in conjunction with twelve references to killing as "murder" and six references to firearm as "murder weapon," was improper. In the present case, there were fourteen references to the term "victim," far less than the twenty-seven references at issue in *Albino*. Additionally, the defendant's challenge in the present appeal is limited to the prosecutor's use of the term "victim," and does not include any additional terms. In sum, we conclude that the prosecutor's use of the term "victim" on fourteen occasions was not improper.

Even if we were to assume that each of these uses of the term "victim" by the prosecutor was improper, we cannot conclude that the defendant satisfied his

burden of demonstrating that those improprieties were so egregious as to amount to a denial of due process. "To aid us in determining whether prosecutorial impropriety so infected the proceedings with unfairness as to deprive a defendant of a fair trial, [our appellate courts apply] the factors set forth in *State* v. *Williams*, 204 Conn. 523, 540, 529 A.2d 653 (1987). These factors include: the extent to which the [impropriety] was invited by defense conduct or argument . . . the severity of the [impropriety] . . . the frequency of the [impropriety] . . . the centrality of the [impropriety] to the critical issues in the case . . . the strength of the curative measures adopted . . . and the strength of the state's case." (Internal quotation marks omitted.) *State* v. *Hinds*, supra, 344 Conn. 563–64.

Applying the *Williams* factors, we conclude that the alleged improprieties did not deprive the defendant of a fair trial. First, the impropriety was not invited by defense counsel. Second, we do not view the alleged improprieties as severe primarily because defense counsel objected to the prosecutor's use of the term "victim" only on the eighth of the fourteen occasions, which suggests that defense counsel did not perceive the term as being severe. See id., 564 (defense counsel's failure to object to allegedly improper comments was strong indication that those comments were not so egregious to rise to level of constitutional violation). Additionally, this court in *Albino* held that the prosecutor's use of the term "victim" on twenty-seven occasions was not so severe as to deprive the defendant of a fair trial; *State* v. *Albino*, supra, 130 Conn. App. 766, 778; whereas the prosecutor in the present case used the term "victim" fourteen times. Third, as explained previously, the use of the term "victim" was not frequent when compared to the entirety of the trial, which was six days and culminated in approximately 900 transcript pages. See id., 779 (prosecutor's use of term "victim" twenty-seven times, although sufficient to constitute an impropriety, did not satisfy third *Williams* factor because uses of term "were infrequent when compared to the entirety" of two week trial and 1000 pages of transcript). Fourth, although neither party takes a position on this factor, we conclude that the alleged impropriety was central to the critical issue in the case, namely, whether Herrera was the victim of an assault or an intruder, allegedly justifying the defendant's use of self-defense. See id. (use of term "victim" by prosecutor was central to critical issue of case, specifically whether defendant was acting in self-defense).

Fifth, no curative instructions as to the prosecutor's use of the term "victim" were adopted; however, this can be attributed "to [defense counsel's] failure to object or request any curative instruction from the court." (Internal quotation marks omitted.) *State* v. *Hinds*, supra, 344 Conn. 564; see *State* v. *Albino*, supra, 130 Conn. App. 780 ("defense counsel has a responsibil-

ity to call perceived prosecutorial improprieties to the attention of the court" and, thus, "the court did not adopt, nor have the opportunity to consider whether to adopt, specific curative measures"). Nevertheless, the court repeatedly instructed the jury—prior to the start of evidence, prior to closing argument, during defense counsel's closing argument, and after the conclusion of closing arguments—that the argument of counsel does not constitute evidence, that the jurors were the sole arbiters of credibility, and that the jurors must confine themselves to the evidence in the record. These general instructions were more than adequate to counteract any harm resulting from the alleged improprieties. See *State* v. *Hinds*, supra, 564; *State* v. *Albino*, supra, 781. Additionally, the prosecutor began his closing argument by informing the jury that it was the fact finder, not him, not defense counsel, and not Judge White.

Sixth, we conclude that the state's case was strong because there was an abundance of compelling evidence supporting the state's first degree assault charge.[20]

The evidence established that the defendant sent K several threatening text messages just prior to her arrival with Herrera at the condominium, stating "[y]our very selfish, what goes around comes around," and "[l]augh now, cry later & I won't feel sorry this time." After K and Herrera arrived at the condominium, the defendant suddenly and violently attacked Herrera with a saw for three to four minutes while the defendant shouted: "This is what you get, this is what you get, this is what you get for fucking my girlfriend." The defendant never disputed that he repeatedly struck Herrera with the saw; rather, the defendant's theory was that he was acting in self-defense because Herrera initiated the confrontation. The defendant's self-defense claim was weak because it was founded entirely on K's account at trial that Herrera took two steps toward the defendant with both of his arms bent in front of him at the elbows. Furthermore, K's testimony drastically contrasted with her description of the incident in her 911 call and to the investigating police officers, in which K told officers that the defendant came out of nowhere and attacked Herrera with a saw. Finally, although the jury deliberated for five days, their deadlock was on the unlawful entry element of the first degree burglary and home invasion charges that resulted in a mistrial, not the assault charge.

In sum, we conclude that the alleged improprieties did not deprive the defendant of a fair trial. Therefore, we reject the defendant's claim that the prosecutor's use of the term "victim" during the trial and closing argument deprived him of his constitutional right to a fair trial.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] As subsequently explained, the defendant also was tried on the charges of burglary in the first degree in violation of General Statutes § 53a-101 (a) (2), and home invasion in violation of General Statutes § 53a-100aa (a) (2). The court declared a mistrial on those two charges after the jury was unable to reach a unanimous verdict.

[2] For ease of discussion, we address the defendant's claims in a different order than they are presented in his principal appellate brief.

[3] In accordance with federal law; see 18 U.S.C. § 2265 (d) (3) (2018), as amended by the Violence Against Women Act Reauthorization Act of 2022, Pub. L. No. 117-103, § 106, 136 Stat. 49, 851; we decline to identify any person protected or sought to be protected under a protection order, protective order, or a restraining order that was issued or applied for, or others through whom that person's identity may be ascertained.

[4] At the time of trial in November, 2017, the defendant and K were engaged to be married.

[5] This court sua sponte raised at oral argument the issue of whether the defendant's claim that the court incorrectly denied his motion to dismiss the first degree burglary and home invasion charges was moot because a mistrial was entered on those counts. In response, both parties contended that this claim was not moot. An appeal from the denial of a motion to dismiss may become moot if the state's ability to recharge the defendant has been foreclosed, for instance, if the original charges were nolled and the statute of limitations had expired; see *State* v. *Owen*, 331 Conn. 658, 664 n.5, 207 A.3d 17 (2019); *State* v. *Williams*, 106 Conn. App. 323, 327, 941 A.2d 985, cert. denied, 287 Conn. 908, 950 A.2d 1287 (2008), cert. denied, 556 U.S. 1153, 129 S. Ct. 1683, 173 L. Ed. 2d 1038 (2009); or if the jury finds the defendant guilty of the charges. See *State* v. *Ward*, 306 Conn. 698, 713, 52 A.3d 591 (2012). Neither of these circumstances are present here because the state, as it represented at oral argument before this court, has the ability to recharge the defendant with first degree burglary and home invasion. Therefore, we agree with the parties that the defendant's claim is not moot.

[6] We pause to resolve a discrepancy stemming from the August 7, 2017 information and the October 23, 2017 information. As noted previously, count two of the August 7, 2017 information charged the defendant with a violation of § 53a-101 (a) (3), whereas count two of the October 23, 2017 information charged the defendant with a violation of § 53a-101 (a) (2). The August 7, 2017 information was operative for purposes of the defendant's motion to dismiss, and, despite the parties' representations in their appellate briefs to the contrary, it is apparent from the record that the October 23, 2017 information was operative for purposes of trial.

[7] It is unclear from the record whether K's text messages to the defendant—in which K requested that the defendant return his keys and instructed him that he no longer lived there—occurred prior to, during, or after the defendant's visit to the condominium with K's family on the day before the crime. Viewing the evidence in the light most favorable to the state, as we are required to do when reviewing a court's decision on a pretrial motion to dismiss; *State* v. *Pelella*, 327 Conn. 1, 18–19, 22 n.17, 170 A.3d 647 (2017); we will assume for purposes of our analysis that the text messages occurred after the defendant had left the condominium that day.

[8] After the state rested its case at trial, defense counsel orally moved to dismiss the first degree burglary and home invasion charges on the same ground. The court denied defense counsel's oral motion. On appeal, the defendant does not challenge the propriety of the court's denial of the oral motion to dismiss.

[9] General Statutes § 54-56 provides that "[a]ll courts having jurisdiction of criminal cases shall at all times have jurisdiction and control over informations and criminal cases pending therein and may, at any time, upon motion by the defendant, dismiss any information and order such defendant discharged if, in the opinion of the court, there is not sufficient evidence or cause to justify the bringing or continuing of such information or the placing of the person accused therein on trial."

[10] Practice Book § 41-8 provides in relevant part: "The following defenses or objections, if capable of determination without a trial of the general issue, shall, if made prior to trial, be raised by a motion to dismiss the information . . . (5) Insufficiency of evidence or cause to justify the bringing or continuing of such information or the placing of the defendant on trial . . . ."

[11] The defendant recognizes in his principal appellate brief that "[t]here is a well-developed body [of] law interpreting . . . § 53a-100 (b), as well as its application to the separate acts of unlawful entry and unlawful remain-

der in dwellings as they relate to the burglary and home invasion statutes." Nevertheless, the defendant primarily relies on summary process statutes; see General Statutes § 47a-23 et seq.; and landlord tenant statutes; see General Statutes § 47a-43 et seq.; to contend that he had the "legal authority" to be inside the condominium because K had not formally evicted him. The defendant in his appellate reply brief states that, "[a]lthough the defendant agrees that these [statutes] are not controlling, it is certainly worthwhile to consider when determining whether the defendant, as a matter of law, could have been unlawfully occupying the premises." We are not persuaded by this argument and, instead, we apply our established criminal precedents to determine whether the defendant was "licensed or privileged" to enter the condominium at the time of the incident. See General Statutes § 53a-100 (b).

[12] The defendant further contends that he made a request to present testimony in support of his motion to dismiss in his November 4, 2016 motion for hearing in advance of trial. The defendant, however, represented in that motion that "[i]t is likely that no evidence or live testimony will be necessary in order for the court to adjudicate the issues raised in the motion to dismiss."

[13] We note that the factual predicate of the defendant's claim is not as grave as he presents it. Of the twenty-four times that the defendant contends that the court used the term "victim," the court used the phrase "alleged victim" nine of those times and the phrase "female victim," presumably to refer to K, two of those times.

[14] The defendant also urges this court to adopt the rationale of the dissent in *State* v. *D'Antonio*, 274 Conn. 658, 877 A.2d 696 (2005), in which Justice Katz concluded, in contrast to the majority, that a violation of the *Niblack* rule was structural error and, thus, harmless error analysis was inappropriate. Id., 722 (*Katz, J.*, dissenting); see *State* v. *Niblack*, 220 Conn. 270, 280, 596 A.2d 407 (1991) (establishing nonconstitutional rule that it is improper for trial judge to preside over defendant's trial after having participated actively in unsuccessful plea negotiations in case). We decline to adopt the rationale of Justice Katz' dissent because *Niblack* is not implicated in the present case and it is axiomatic that we cannot accept the rationale of the dissent because we are bound by the majority's decision in *D'Antonio*. See *State* v. *Hurdle*, 217 Conn. App. 453, 475, 288 A.3d 675 (explaining that Appellate Court is bound by, and cannot overrule or discard, decisions of our Supreme Court), cert. granted, 346 Conn. 923,      A.3d      (2023).

[15] Defense counsel, however, did ask Herrera: "In the week prior to this tragedy, describe your relationship with [K]. Was it something where you were socializing with her? Were you arranging a date with her? Were you giving her employment advice? Were you mentoring [her]? What's the best [way] to understand it?" Herrera responded: "I can't recall a specific week two and a half years ago. I'm sorry, I can't answer that question."

[16] To be clear, the defendant does not challenge on appeal the court's evidentiary rulings excluding certain text messages and sustaining the state's objections to his last three questions as to the volume of text messages. Instead, he argues that his confrontation clause rights were violated because he was prohibited from questioning Herrera regarding the *content* of these text messages, including Herrera's DUI, Herrera's comments about defense counsel in the DUI case, and the sexual nature of Herrera's relationship with K. In his appellate reply brief, the defendant did not address the state's argument that he abandoned this claim.

[17] In his appellate brief, the defendant supports his prosecutorial impropriety claim with reference to three categories of statements: (1) the prosecutor's use of the term "victim" at least four times during pretrial hearings; (2) the prosecutor's use of the term "victim" at least twenty times in front of the jury; and (3) the witnesses' use of the term "victim" an unspecified number of times.

First, we summarily reject the defendant's reliance on the first category of statements because they were made by the prosecutor in pretrial hearings outside the presence of the jury and, accordingly, cannot serve as the basis for his prosecutorial impropriety claim. See *State* v. *Warholic*, supra, 278 Conn. 370 n.7 (explaining that reason prosecutor's use of term "victim" could support prosecutorial impropriety claim is because jury could understand that state was expressing its personal opinion that defendant had victimized complainant).

Second, with respect to the second category of statements, at oral argument before this court, the defendant represented that the state, in its appellee brief, adequately had identified each of the times the prosecutor

used the term "victim" to refer to Herrera in front of the jury. We construe defense counsel's representations as accepting the state's recitation of the fourteen times that the prosecutor used the term "victim" to refer to Herrera as the basis for his claim.

Third, the defendant at oral argument before this court abandoned the aspect of his claim based on the third category of statements.

[18] As an initial matter, we agree with both parties that it is immaterial whether the defendant's one objection to the prosecutor's use of the term "victim" preserved his prosecutorial impropriety claim because "under settled law, a defendant who fails to preserve claims of prosecutorial [impropriety] need not seek to prevail under the specific requirements of *State* v. *Golding*, [supra, 213 Conn. 239–40], and, similarly, it is unnecessary for a reviewing court to apply the four-pronged *Golding* test." (Internal quotation marks omitted.) *State* v. *Hinds*, 344 Conn. 541, 555 n.7, 280 A.3d 446 (2022). "The reason for this is that the defendant in a claim of prosecutorial misconduct must establish that the prosecutorial misconduct was so serious as to amount to a denial of due process . . . ." (Internal quotation marks omitted.) *State* v. *Darryl W.*, 303 Conn. 353, 375 n.19, 33 A.3d 239 (2012).

[19] The state does not contest on appeal that the commission of a crime, specifically the defendant's assault of Herrera, was at issue. At trial, the defendant's theory of the case was that he acted in self-defense because Herrera initiated the physical confrontation. Thus, despite the fact that the defendant did not dispute that Herrera sustained significant physical injuries during the incident, it was a question of fact whether those injuries were the result of actions taken by the defendant in self-defense or whether they were the result of criminal activity. See *State* v. *Albino*, supra, 130 Conn. App. 766 (commission of crime at issue where "there is no doubt that a homicide occurred and that the defendant was the person who caused it to occur, and the only question for the jury is whether the homicide was justified" based on defendant's theory of self-defense (footnote omitted)).

[20] As for the sixth factor, the defendant argues in full: "The final factor, the strength of the case, weighs in favor of the defendant. The jury had before it evidence that [Herrera] took the initial steps towards the defendant. Similarly, the defendant stayed at the scene while police arrived. This was not a slam dunk case for the state."